IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 5, 2025 Session

**ANDREW HAYES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-03864      Paula L. Skahan, Judge**

_____

**No. W2024-01770-CCA-R3-ECN**
_____

In 2010, a Shelby County jury convicted the Petitioner, Andrew Hayes, of first degree felony murder and aggravated robbery, and the trial court imposed an effective sentence of life imprisonment. After unsuccessfully pursuing a variety of post-conviction remedies in state and federal court, the Petitioner filed a petition for writ of error coram nobis, wherein he included nine pieces of "new" evidence and argued that he was entitled to equitable tolling of the one-year statute of limitations. He then filed an amended petition for writ of error coram nobis, wherein he included a tenth piece of "new" evidence as well as some allegedly exculpatory evidence and argued that the statute of limitations should be tolled because this newly discovered evidence met the standard in Clardy v. State, 691 S.W.3d 390 (Tenn. 2024). The coram nobis court summarily dismissed the coram nobis petition, holding that it was untimely because the Petitioner was not entitled to equitable tolling. The Petitioner now appeals, arguing that the summary dismissal of his petition for writ of error coram nobis was in error. After review, we affirm the judgment of the coram nobis court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which KYLE A. HIXSON, and STEVEN W. SWORD, JJ., joined.

Jason Gichner, Madison Lowery, Jennifer Burch, and Candi Henry, Nashville, Tennessee, for the appellant, Andrew Hayes.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Ronald L. Coleman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On or around August 20, 2007, the victim, Danny Harris, was beaten to death in his apartment in Memphis, Tennessee. See State v. Hayes, No. W2010-02641-CCA-R3-CD, 2012 WL 3192827, at *1, *7 (Tenn. Crim. App Aug. 6, 2012) (Hayes I), perm. app. denied (Tenn. Nov. 28, 2012). The victim's decomposing corpse was found in his apartment on October 26, 2007. Id. at *1, *3-4. On June 19, 2008, a Shelby County jury indicted the Petitioner for first degree felony murder and aggravated robbery. Id. at *10.

Janice Jefferson, also known as "Snow,"[1] testified that in August 2007 she lived at 1651 Depass Street in Memphis with the Petitioner; her daughter, Chawonna Jefferson; and her two sons. Id. at *1. Snow stated that the Petitioner had "a nervous condition" and was dating her daughter. Id. At the end of August 2007, Snow said Sarah Lucas and her boyfriend Miguel moved into her home because Chawonna and the Petitioner were preparing to move out. Id. Tammy Vance, Sarah's mother, also moved in for a short period of time, telling Snow that she needed a place to live while her boyfriend, the victim, "was in rehab." Id. At that time, Tammy had a black eye and a deep scratch mark on her forehead and claimed that the victim had hit her in the eye because he was drinking, which was why he went to rehab. Id. Snow noted that during the period they lived in her home, Tammy and Sarah drove a nice four-door truck, claiming the victim had given them permission to drive it while he received treatment at a rehabilitation facility. Id.

Snow stated that the Petitioner and Chawonna did not move out as planned and continued to live at her home along with Tammy, Sarah, and Miguel. Id. In October, Snow asked Tammy, Sarah, and Miguel to move out because they were unable to pay the utility bill. Id. Tammy moved out first, but she later brought in a television, claiming that it had been given to her by a lady who lived nearby. Id. Tammy brought in a handgun and offered it as payment to Snow; Tammy later asked Snow to help her sell this gun and the victim's truck because the victim was going to be in rehab longer than he thought and had instructed her to sell his property to buy some food. Id. Snow referred Tammy to someone she called "Wheelchair John," who helped Tammy sell the gun. Id. Snow became concerned about Tammy's selling of the victim's property, so she called the police. Id.

On October 31, 2007, Snow met police officers at a convenience store, where the officers surrounded Tammy, who was driving the victim's stolen pickup truck. Id. at *2-3. Snow took the officers to her home, told them about the items Tammy had given her in exchange for rent, and Snow gave the officers permission to search her home. Id. at *2.

---

[1] Because of the large number of witnesses in this case, we will often refer to them by their first name or by their first and last name for comprehensibility. We intend no disrespect in doing so.

On cross-examination, Snow admitted that she never saw the Petitioner in possession of any item belonging to the victim and that she had no knowledge of the Petitioner being involved in the victim's murder. Id. Snow said that as far as she knew, the Petitioner had no relationship with Tammy or Sarah and had not met either woman before the two women moved into her home. Id.

Snow stated that on October 31, 2007, officers drove her to the police station to give a statement, and the Petitioner followed them in a borrowed car to give her a ride home. Id. She and the officers left at around 7:00 p.m. on October 31, 2007, and officers returned her to her home on November 2, 2007, which was when they "kept" the Petitioner. Id. Snow said officers asked her to return to the station during the early morning hours of November 2, 2007, and when she got to the station, the Petitioner "screamed out" to her, "I love you momma, take care of my baby." Id. Snow said officers then told her that the Petitioner had implicated her in the victim's murder, and she asked the Petitioner why he had lied. Id.

Sarah Lucas testified that in August 2007, she moved from her home on Cecilia Street to Snow's home on Depass Street. Id. She said she knew the Petitioner only as "Snow's son-in-law" and knew the victim as "a man that [her] mother lived with." Id. Sarah stated that sometime in the beginning of August, Tammy, who was bleeding from a cut on her head, came to her home on Cecilia Street. Id. Tammy, who was driving the victim's truck at the time, said the victim had struck her and had decided to enter rehab because he was drinking too much. Id. Sarah and Tammy moved in with Snow about two weeks later. Id. She remembered that Tammy gave Lucas's boyfriend, Miguel, "a DVD/TV type deal" for his birthday and that she did not believe that this television legally belonged to Tammy. Id. Sarah also said that Tammy brought "a big, huge TV" to Snow's home in the back of the victim's truck. Id.

Sarah said that she first learned of the victim's death when police officers arrived to take her in for questioning because she had pawned a "DVD/VCR" that belonged to the victim. Id. The officers later told her the victim had been murdered inside his apartment. Sarah claimed that she pawned the "DVD/VCR" at Tammy's request and that Tammy had said the victim had given his permission for that item to be pawned. Id. Sarah insisted that she knew nothing about the victim's murder. Id.

On cross-examination, Sarah asserted that she testified at trial because Tammy had implicated her in the victim's murder, and she wanted to "clear [her] name" and "get justice for" the victim. Id. at *3. She claimed her mother Tammy had accused her of the victim's murder because she was "crazy" and acknowledged that Tammy was currently in prison for the victim's murder. Id. Sarah said she had no knowledge of the Petitioner's involvement in the victim's murder. Id.

Sarah admitted that the prosecutor had "cleared . . . up" her outstanding warrants for drug possession and prostitution that she had when she moved to Texas in 2008. Id. Sarah said Tammy asked to stay with her in August 2007 because she did not want to stay by herself across town. Id. To her knowledge, Tammy and the Petitioner did not have any type of personal relationship. Id.

Officer John Pasley with the Memphis Police Department ("MPD") testified that after the victim's truck was seized at the gas station and Tammy Vance was arrested, Snow and Chawonna Jefferson approached him and said Tammy had left some items at their home that they thought the police might be interested in. Id. at *4. Snow later showed Officer Pasley "a TV, a cell phone, and a little notebook journal" that she believed had belonged to the victim. Id. Officer Pasley contacted the homicide detectives, who asked him to call the crime scene unit to photograph and collect this evidence. Id. He then drove Snow and Chawonna to the police station, and the Petitioner followed driving a separate car. Id. Officer Palsey then went to pick up Sarah Lucas, Lucas's boyfriend, and Wayne Bobo. Id. Although he was unable to locate Bobo, he transported Sarah and her boyfriend to the police station. Id.

The next day, Officer Pasley met with John Watkins, who was confined to a wheelchair, based on information that Watkins had bought the victim's handgun. Id. Officer Pasley then recovered the victim's gun from Watkins. Id.

Agent Richard Howard of the Bureau of Alcohol, Tobacco, and Firearms testified that the Sig Sauer .40 caliber handgun recovered by Officer Pasley had been purchased by the victim on October 31, 2000. Id.

Crime Scene Investigator Jeffrey Garey with the MPD testified that when he arrived at the victim's apartment, the victim's body was in a severe state of decomposition . Id. He collected a Sig Arms "gunbox," a piece of mail postmarked August 14, 2007, a partial loaf of bread with an expiration date of August 17, bloody sheet rock and paint samples, three rings from the dresser, "an instruction manual for a Hitachi DVD player with video cassette recorder," and the sheets, pillows, and pillowcases from the bed where the victim's body was discovered. Id. He also photographed an unidentified light spot with other lighter speckled spots on the carpet in the bedroom, "possible blood spatter" on the south wall of the living room, "a corner of a wall area" that seemed to have "a blood print," a door jamb "where a possible bloody print was located," and "blood spatter on two separate walls in the bedroom." Id.

Lieutenant Bart Ragland with the MPD testified that he and Sergeant Parks interviewed the Petitioner, who they believed had relevant information because he was

involved with Tammy Vance and her daughter, Sarah Lucas. Id. During the first interview, the Petitioner's "story kept changing and changing and changing." Id. Lieutenant Ragland said it was obvious that the Petitioner knew more than he was telling them and that the Petitioner was more involved in the offenses than simply being a witness, so they gave the Petitioner his Miranda warning. Id. Because the Petitioner had difficulty reading the advice of rights form, Lieutenant Ragland "read the entire thing to him." Id. He said the Petitioner "understood" the advice of rights form, and they "went over it." Id. Lieutenant Ragland said that the Petitioner signed the written waiver of his rights at 3:15 p.m. on November 2, 2007, and he gave a statement at 5:57 p.m. the same day implicating Tammy Vance in the victim's murder and explaining that he traveled with Tammy and Lucas's boyfriend, Miguel, to an apartment in Cordova to get a thirty-six-inch television. Id. The Petitioner said he opened a door to a bedroom because he "smelled a foul odor" and observed the victim's body lying on the bed. Id. The Petitioner said Tammy told him to not worry about the body because she and Miguel "were going to take care of it." Id. The Petitioner described the body as "a white male, he was laying [sic] on his left side. He was about in his mid-fifties. He was medium build. His skin was turning black. His hair was brown, and he had a mustache, too." Id. The Petitioner said he did not notice anything in the victim's mouth or any blood in the room. Id. He and Miguel loaded the television into the victim's truck and Tammy took "a VCR and a DVD player that was built together and DVD movies." Id. They left the victim's apartment and returned to the Depass Street home to pick up Sarah so that Sarah could pawn the items. Id. The Petitioner told Lieutenant Ragland that he did not tell anyone about seeing the victim's body in the apartment because he was afraid that he would be charged with the victim's murder because he helped move the television. Id.

Lieutenant Ragland said that the fact that the Petitioner had been able to describe the victim as a white male was suspicious because "the state of the decomposition of the victim at the time" made it difficult "to tell that [the victim] was indeed a male white." Id. at *5. Lieutenant Ragland stated that he spoke to the Petitioner a second time and the Petitioner "gave a statement, but he stopped . . . And he refused to sign the statement." Between the Petitioner's two statements, Lieutenant Mullins "interviewed" the Petitioner, and "it became apparent that [the Petitioner] had more involvement" than he had originally admitted. Id. During this second statement, the Petitioner initially admitted he had been involved and hit the victim with a steel pipe before the Petitioner "recanted and said that, no, he didn't actually do it." Id. After he recanted, the Petitioner "became hysterical and started crying, and at that point, it became obvious [that officers] couldn't talk to him anymore." Id. A short time later, the Petitioner was booked into the jail "on a forty-eight [-]hour hold." Id.

Lieutenant Ragland asserted that he became suspicious of the Petitioner when the details of the Petitioner's statement changed over time. Id. However, Lieutenant Ragland

admitted that he was not present when the Petitioner first admitted that he struck the victim with a pipe. Id. He said that following the recantation of his admission to murder, the Petitioner blamed the victim's murder on Wayne Bobo, Snow, and Chawonna Jefferson. Id. He stated that the Petitioner became "hysterical," and it was impossible to continue the interview. Id. Lieutenant Ragland denied that the Petitioner was upset at being accused of a crime he did not commit and claimed that the Petitioner was upset "[b]ecause he had admitted to his involvement[,] and he knew he was up sh[-]t creek without a paddle[.]" Id. He stated that the Petitioner immediately began recanting and blaming others "because that's what criminals do." Id.

Sergeant Anthony Mullins of the MPD testified that he interviewed the Petitioner after the Petitioner was developed as a possible suspect in the victim's murder. Id. He said that when he first encountered the Petitioner, the Petitioner was in Lieutenant Toney Armstrong's office. Id. He asserted that the Petitioner was able to "describe things in the apartment and describe things that happened[,]" and when he asked the Petitioner additional questions, the Petitioner provided "particular details that no one would know[,] unless they committed the act." Id. Sergeant Mullins said that upon further questioning, the Petitioner provided the following statement in which he admitted to killing the victim:

> They went there, [the Petitioner] and Tammy Vance, to rob [the victim], and when they got inside[,] an argument ensued. [The victim] wanted to know why they were there, how they got in his apartment, because Miss Vance had a key. And during the argument, Tammy Vance threw a container of bleach at [the victim] and then [the Petitioner] said he struck [the victim] in the head with an iron pipe, pushed him in the bedroom[,] and struck him again, and again, and again. Ultimately, he said, between seven and nine time[s].

Id.

Sergeant Mullins asserted that the Petitioner's statement "explained some of the things" the officers observed in the victim's apartment, like the rag in the victim's mouth, which the Petitioner said Tammy had "stuck . . . in [the victim's] mouth to stop him from screaming." Id. at *6. Sergeant Mullins said that when they began taking a "formal" statement the second time, the Petitioner was "getting some [details] wrong" such as the location of the victim's apartment. Id. When he questioned the Petitioner about his mistakes, the Petitioner became "very upset" and claimed that "people ha[d] threatened him about this incident." Id. The Petitioner then blamed Wayne Bobo and someone named Miguel for the victim's murder but continued to admit he was present during the murder. Id. During this time, the Petitioner was "[l]oudly crying and yelling." Id. When it was obvious the officers would be unable to obtain a statement from the Petitioner, they took

- 6 -

him "down to the jail on a hold" because they "felt like" they had sufficient proof "to charge him" but were not prepared to charge him at that point. Id.

Sergeant Mullins testified that officers brought the Petitioner to the homicide office for another interview the following morning. Id. The Petitioner was given Miranda warnings a second time. Id. At that point, the Petitioner provided a statement admitting he murdered the victim by striking him with a metal pipe "about seven or eight times on the head." Id. The Petitioner said he went to the victim's apartment to "rob him[,]" and Tammy told him to ride with her to rob her boyfriend. Id. The Petitioner admitted, "I struck [the victim] the first time with the pipe. [Tammy] grabbed [the victim] by the mouth and shoved a face towel in his mouth." Id. The Petitioner stated that he did not get blood on him and that Tammy threw the murder weapon in the Wolf River. Id.

Sergeant Mullins said he had been trained in "basic blood stain pattern analysis," which he described as "locating, analyzing, and documenting blood stain patterns on crime scenes and then interpreting that evidence to determine what can be determined." Id. Sergeant Mullins said that he had been at the crime scene for hours and that the Petitioner's statement corroborated what he had observed at the crime scene. Id. He specifically noted "cast-off" blood stains on the wall in the bedroom, which he said were the result of blows to the victim. Id. Sergeant Mullins stated, "Once a blow is given and blood is transferred from him to the instrument, every swing is going to cast blood off of that object, and in this case, a lot of it hit[] the surface of the wall." Id. He identified blood that was cast off on the floor and the closet door. Id. Sergeant Mullins said that based upon the "six distinct patterns" of blood stain, it appeared that the victim "had been hit at least six to eight times." Id. He stated that a "hard shove" would have sent the victim from the doorway of the bedroom onto the bed. Id.

Dr. Marco Ross, the forensic pathologist who performed the victim's autopsy, testified that the victim's cause of death was "[b]lunt force injuries of the head and asphyxia." Id. at *7. He noted that the victim sustained "fractures of the skull in the right frontal area [and] the left frontal area" as well as "some fractures . . . around the orbit of the right eye, and the face, and a little bit on the right cheek, and the roof of the orbit on the right eye." Id. He also said the victim "had a fracture of the left upper canine tooth," which he found in "the airway of the right lung, probably in the region of the right main stem bronchus." Id. Dr. Ross noted "some hemorrhage or material consistent with hemorrhage in the brain itself, although, due to the decomposed nature of the brain, it was difficult to precisely delineate where that hemorrhage may have originally come from." Id. He stated that the victim was in "a moderately advanced state of decomposition." Id. He observed that the victim "had an orange towel . . . stuffed into his mouth" and this towel pushed the victim's tongue back "and effectively block[ed]" the victim's airway. Id. Dr.

- 7 -

Ross said the location of the victim's tooth in his bronchial tubes indicated that the tooth was knocked out before the rag was stuffed into the victim's mouth. Id.

Dr. Ross explained that the victim had "a total of eight lacerations to the head area" and that based on the locations of the lacerations on the head and face, he opined that the victim sustained "a minimum of five and a maximum of eight blows to the head." Id. Dr. Ross stated that he removed the victim's pacemaker during the autopsy. Id.

Joel Hunt, an employee in the "pacing division" of Boston Scientific, testified that he was charged with programming and troubleshooting implantable pacemakers and defibrillators. Id. After examining the data removed the victim's pacemaker, he learned that on August 20, 2007, the victim's heart rate accelerated to 205 beats per minute, activating the pacemaker, which regulated his heart rate. Id. The victim's heart rate then accelerated to 289 beats per minute, which activated the defibrillator. Id. The defibrillator delivered two shocks, and after that point, nothing else was detected or sensed. Id. Although he was unable to say when the victim died, he could state that all of the victims' heart activity ceased on August 20, 2007. Id.

Four witnesses testified for the defense. Dr. Randy Schnell, the Clinical Services Coordinator of the Memphis City Schools Mental Health Center, identified a psycho-educational evaluation performed in 1992 on the Petitioner to determine his eligibility for special education services. Id. at *8. He said the Petitioner's intelligence quotient ("IQ") at the time of this 1992 test was 62, which was "well below average" and indicated that the Petitioner's "mental development would be significantly delayed compared to other children his age." Id. Dr. Schnell stated that the Petitioner's IQ was "consistent with mental retardation." Id. Moreover, he said the Petitioner's scores on the Woodcock Johnson Behavior Scales confirmed a diagnosis of mental retardation. Id. He asserted that it was "[e]xtremely unlikely" that the Petitioner's IQ score would have increased to normal levels by adulthood, stating that IQ scores "are reasonably stable by [the] age [of] fourteen," which was when the Petitioner was tested. Id.

Chawonna Jefferson, who was twenty-one years old at the time of trial, testified that she and the Petitioner dated for several years and had a three-year-old child. Id. When the victim died, she and the Petitioner lived with her mother, Snow. Id. Chawonna said that Tammy and Sarah came to live with them in late August 2007 and at the time, the two women were driving a Silverado truck, and Tammy had a bruise on her head and a black eye. Id.

The Petitioner, who was twenty-nine years old at the time of trial, testified that he had never met the victim. Id. He explained that he had only completed the seventh grade in school and had only taken resource classes. Id. At the time of the victim's murder, the

Petitioner's only source of income was his Social Security Disability check of $685 per month.  Id.  He said he first met Tammy when she and Sarah moved into the home owned by Snow.  Id.  At the time, Tammy and Sarah were in the victim's truck.  Id.  The Petitioner noted that at that time, Tammy "had a gash in the center of her forehead[,] and her eye was black."  Id.

The Petitioner stated that on November 2, 2007, police officers came to their home and asked him, Chawonna, and Snow to go to the station for questioning.  Id.  They traveled to the station in the family vehicle.  Id.  The Petitioner stated that after he waited alone in the interview room for several hours, Lieutenant Ragland informed him that Tammy had implicated him in the victim's murder.  Id.  The Petitioner informed him that he had no part in the victim's death.  Id.  Although he initially denied any knowledge of Tammy's possession of the victim's handgun, he later told officers that he had gone with Tammy and Snow to sell the gun to "Wheelchair John."  Id.  He asserted that his initial interrogation lasted "hours[,]" and he "got tired of sitting there."  Id.  The Petitioner said the officers repeatedly screamed at him for hours until he finally said, "What the f[--]k do you want to hear, what do you want me to tell you[?]"  Id.  At that point, he said the officers manufactured a statement that was supposedly given by him.  Id.

The Petitioner stated that although he did not know whether Tammy had killed the victim, he told officers she "probably" killed the victim because she had accused him of doing so.  Id. at *9.  When he was at the police station, the officers showed him a live feed of Tammy's interrogation and told him she was accusing him of the victim's murder.  Id.  The Petitioner admitted that he accused several others, including Snow, of killing the victim "just so they would leave him alone."  Id.

On cross-examination, the Petitioner stated that he had never given a statement in a criminal case prior to this case and had never testified in court.  Id.  He admitted that he had tattoos of a pitchfork and "folk," which were associated with the Gangster Disciples gang.  Id.  The Petitioner claimed the State's evidence against him was very limited, stating:

The only evidence you all got against me is what Tammy said and that bogus statement that I gave.  That's all you got.  The detective just admitted it yesterday.  If I wouldn't have said I had nothing to do with killing [the victim], I wouldn't be sitting here today.  By me being stupid and constantly just allowing them to jus[t] drill me the way they did, if I would have just left it alone and let them deal with the[ir] job, I wouldn't be sitting here today. You know it and I know it.

- 9 -

Id.  The Petitioner asserted that he did not kill the victim and claimed that his statement contained only the repeated details about this crime that detectives had provided to him. Id.

Tammy Vance testified that she entered a guilty plea to first degree murder and aggravated robbery related to the victim's death.  Id.  However, she denied killing the victim, who she met through a chat line in January 2007.  Id.  Tammy stated that she lived with the victim for two-and-a-half months and that during this period, the victim was in poor health because "all he did was drink beer and smoke cigarettes."  Id.  She claimed the victim gave her full access to his truck and his personal finances, which mostly came from retirement benefits, so she could manage his personal affairs.  Id.  She asserted that the victim intended to file for bankruptcy because he was unable to support himself.  Id.

Tammy said that on August 20, 2007, she and the victim awoke early to take Sarah to West Memphis to obtain an identification card.  Id.  Tammy said Sarah was addicted to crack cocaine, and the victim felt bad for her because he also had an addiction.  Id.  After obtaining Sarah's identification card, they went to Burger King, where the victim bought food for Sarah.  Id.  When Tammy told the cashier to keep the change, the victim became "irate" and began "beating his fists on the dashboard" and "slapping his hat."  Id.  Despite the victim's outburst, they returned to the victim's apartment, where Tammy fixed a fried egg sandwich for the victim.  Id.  Although the victim started eating, he suddenly "put his sandwich down" and got up.  Id.  Tammy said, "[The victim] balled up his fist[,] and he hit me in my head and split my head wide open, and I was dazed, [and] I fell on my knees to the floor."  Id.  When she regained consciousness, Tammy found the victim and Sarah in the victim's bedroom.  Id.  Tammy said that Sarah "had hit [the victim] with a hammer in the head, and he was laid back on the bed."  Id.  Tammy claimed she tried to stop Sarah, but Sarah struck the victim "a couple of times" and then struck Tammy one time.  Id. Tammy said that Sarah hit the victim "a total of seven or eight times" and then shoved a rag into the victim's throat.  Id.

Tammy said Sarah's violent attack on the victim caused her to go into "total shock" where she did not know what to do.  Id. at *10.  She observed Sarah pouring kerosene and some "cleaning substances" over the victim's body.  Id.  Sarah then instructed Tammy to pack her things, and Tammy complied with this request.  Id.  Sarah and Tammy then left the victim's apartment in the victim's truck.  Id.  Tammy claimed Sarah put the murder weapon in her bag and later disposed of it in a dumpster near a convalescent home.  Id.

Tammy said a few days later, she and Sarah returned to the victim's apartment to get a television and several other things to pawn for money.  Id.  Tammy claimed this was the first time she met the Petitioner.  Id.  Tammy said she and Sarah decided to blame the victim's death on Wayne Bobo, and Tammy implicated Bobo when the police initially

questioned her.  Id.  After officers told her that the Petitioner had confessed, Tammy blamed the Petitioner for the murder to protect her daughter, Sarah.  Id.  Tammy claimed that "not a bit" of her statements incriminating the Petitioner were true.  Id.

Tammy maintained that after she was charged with the victim's murder, she attempted to tell her attorney that Sarah committed the murder.  Id.  Tammy acknowledged that although she was innocent, she decided to plead guilty.  Id.  Prior to entering her guilty pleas, Tammy wrote a statement exonerating the Petitioner and asked her attorney to give it to defense counsel.  Id.

On cross-examination, Tammy admitted that she continued to cash the victim's checks.  Id.

At the conclusion of trial, the jury found the Petitioner guilty, as charged, of first degree felony murder and aggravated robbery, and the trial court imposed concurrent sentences of life imprisonment for the murder conviction and twenty years for the aggravated robbery conviction.  Id.

Following his conviction, the Petitioner filed a direct appeal, claiming that the trial court erred by denying his motion to suppress his statements to police on the basis that they were the product of coercion, that the trial court erred by admitting six photographs depicting the victim's decomposing body, that the evidence was insufficient to sustain his convictions, and that the trial court committed plain error in instructing the jury on criminal responsibility.  Id. at *10-17.  This court affirmed the trial court's convictions, and the Tennessee Supreme Court denied permission to appeal.  Id. at *1.

After his direct appeal, the Petitioner unsuccessfully pursued various post-conviction remedies in state and federal court.  The Petitioner filed a pro se petition for post-conviction relief, and following the appointment of counsel, filed an amended petition for post-conviction relief in the trial court, alleging that his trial counsel provided ineffective assistance by failing to have a mental evaluation performed on the Petitioner, by failing to call a witness to testify at trial, by failing to strike an individual from the jury, and by failing to test a bloody fingerprint found at the crime scene against Sarah Lucas's fingerprints.  Hayes v. State, No. W2016-00280-CCA-R3-PC, 2017 WL 2805205, at *3 (Tenn. Crim. App. June 28, 2017) ("Hayes II"), perm. app. denied (Tenn. Nov. 20, 2017).  On October 5, 2015, the post-conviction court entered an order denying the petition following a hearing, and on February 22, 2016, this court entered an order allowing the late filing of the Petitioner's notice of appeal.  Id. at *6.  This court affirmed the denial of post-conviction relief, and the Tennessee Supreme Court denied permission to appeal.  Id. at *1.

On January 29, 2018, the Petitioner filed an unsuccessful petition for writ of habeas corpus in the Western District of Tennessee. Hayes v. Genovese, No. 2:18-cv-02070-TLP-tmp, 2022 WL 883459, at *1 (W.D. Tenn. Mar. 24, 2022) ("Hayes III"). In this petition, the Petitioner asserted that (1) trial counsel was deficient in failing to (a) conduct a mental evaluation, (b) to call Ms. Wheeler as an eyewitness, (c) to strike a juror, (d) to compare the fingerprints at the crime scene against the fingerprints of Sarah Lucas; (2) trial counsel performed deficiently in failing to object to the trial court's jury instructions; and (3) the trial court violated his due process rights by denying his motion to suppress his statements to police. Id. at *17. On March 24, 2022, the federal habeas court denied the Petitioner's issues (1)(a)-(d) and (3) for lack of merit and denied issue (2) as procedurally defaulted before dismissing the petition with prejudice. Id. at *17-28. The court also denied a certificate of appealability. Id. at *28-29.

On November 9, 2022, the Sixth Circuit Court of Appeals also denied the Petitioner a certificate of appealability. Hayes v. Genovese, No. 22-5378, 2022 WL 19843176, at *3 (6th Cir. Nov. 9, 2022) (Hayes IV).

On April 28, 2023, the Petitioner filed a second petition for post-conviction relief. On May 25, 2023, the Petitioner filed a motion for fingerprint analysis and a motion for DNA analysis.

## PETITION FOR WRIT OF ERROR CORAM NOBIS

On June 25, 2024, the Petitioner filed a "Motion to Reopen Post-Conviction Proceedings & Petition for Writ of Error Coram Nobis."[2] With regard to the coram nobis petition, the Petitioner argued (1) the evidence he presented in his petition qualified as "newly discovered" evidence under the coram nobis statute, and he was not at fault in failing to present this evidence at an earlier proceeding; (2) due process requires tolling of the one-year statute of limitations; and (3) there was a reasonable probability that the newly discovered evidence may have caused a different outcome had it been presented at trial. In this filing, he identified the following nine pieces of "newly discovered" evidence:

1. **Affidavit of Freddy Brown, Sarah Lucas's sister's live-in boyfriend at the time of the victim's murder**

2. **Affidavit of Sarah Lucas's nephew, Tyler Landers;**

3. **Affidavit of Sarah Lucas's niece, Carleigh Balderas;**

---

[2] The court later entered an order requiring the parties to address the motion to reopen the post-conviction proceedings and the petition for writ of error coram nobis as individual cases.

**4. Interview with Gracee Balderas;**

**5. Affidavit of Chawonna Jefferson, the Petitioner's former girlfriend;**

**6. A letter written in 2018 by Tammy Vance to Sarah Lucas;**

**7. Police Records from Oklahoma.**

**8. Interview with Teresa Davis.**

**9. The recorded phone call with Sarah Lucas.**

The Petitioner asserted that the aforementioned evidence told the following story:

- Sarah's family believes she killed a man in Tennessee with a hammer and then stole his property, because Sarah confessed to doing so.
- Sarah's family believes Tammy entered a guilty plea to protect Sarah from being prosecuted, because Sarah confessed to doing so.
- Sarah has a reputation for violence, dishonesty, and unlawful behavior.
- Tammy and Sarah sent an innocent man to prison to cover for Sarah's crime.
- Sarah and Tammy met the Petitioner <u>after</u> the victim was killed.
- Sarah and Tammy used and profited from the victim's property after his death—the Petitioner did not.

On August 29, 2024, the trial court entered an order directing the court clerk to separate the joint pleadings in the "Motion to Reopen Post-Conviction Proceedings & Petition for Writ of Error Coram Nobis" into two cases because the court intended to adjudicate the motion and petition as two distinct matters.

On October 8, 2024, the coram nobis court entered an order directing the Petitioner to file a supplemental brief addressing the equitable tolling test outlined in <u>Clardy v. State</u>, 691 S.W.3d 390 (Tenn. 2024), which clarified the standard for equitable tolling of the one-year statute of limitations in coram nobis cases.

On October 25, 2024, the Petitioner filed an Amended Petition for Writ of Error Coram Nobis as well as a supplemental brief addressing the impact of <u>Clardy</u>. In the amended petition, the Petitioner argued that tolling of the statute of limitations was required

- 13 -

because the newly discovered evidence met the standard in Clardy, that the evidence he presented qualified as newly discovered evidence, and that there was a reasonable probability the newly discovered evidence may have caused a different outcome had it been presented at trial. In this amended petition, the Petitioner referenced allegedly exculpatory evidence the jury never heard, including the victim's pacemaker records, cellular tower data, the victim's phone records the day of his murder, the victim's phone records following his murder, documents showing that Sarah profited from the victim's stolen property after the murder, fraudulent bank transcriptions implicating Tammy and Sarah, and additional proof showing that Sarah was not credible. The Petitioner claimed this allegedly exculpatory evidence implicated Sarah, rather than the Petitioner, as the victim's murderer and demonstrated that the Petitioner did not know either Tammy or Sarah until after the victim was killed. In addition to the nine pieces of evidence that the Petitioner alleged were newly discovered in his original petition, the Petitioner also asserted that there was a tenth piece of newly discovered evidence:

**10. Expert Report from Dr. Jeffery Neuschatz.**

The Petitioner claimed that Dr. Neuschatz, in his report, opined that "[the Petitioner] was improperly interrogated by law enforcement, resulting in an inaccurate and scientifically unreliable confession that was nonetheless relied upon by the jury when they found [the Petitioner] guilty of the crime[s]." In addition, he claimed Dr. Neuschatz's report emphasized that the following information the Petitioner provided to police was erroneous:

1. The Petitioner stated there was no blood in the bedroom. The crime scene photos show blood and blood spatter throughout the room and on the walls.

2. The Petitioner stated that the crime took place upstairs in the victim's apartment. The victim lived in a one-floor apartment that did not have an upstairs.

3. The Petitioner stated the murder happened two and a half weeks prior to the interrogation by the police. The victim was killed months before the Petitioner was ever questioned by police.

4. The Petitioner stated he beat the victim in the back of the head. The victim did not have injuries to the back of his head.

Moreover, the Petitioner, in his supplemental brief, asserted that, pursuant to Clardy, the limitations period should be tolled because his new evidence was discovered after the expiration of the limitations period, his new evidence clearly and convincingly shows that

- 14 -

he was actually innocent of the underlying crimes, and his coram nobis petition was filed no more than one year after he discovered his new evidence of actual innocence.

On November 15, 2024, the coram nobis court entered an order summarily dismissing the petition for writ of coram nobis, concluding that although the coram nobis petition appeared to be filed no more than one year after the discovery of the facts included in the petition, the facts presented in the coram nobis petition, if presumed true, did not constitute new evidence as contemplated by the coram nobis statute and did not clearly and convincingly demonstrate the Petitioner's actual innocence pursuant to Clardy. With regard to actual innocence, the coram nobis court held that the facts showing "Sarah Lucas's involvement with the victim's murder and Tammy Vance's plan to protect Sarah Lucas from prosecution [for the victim's murder] is merely cumulative evidence" because "[i]t corroborates Tammy Vance's trial testimony that she falsely accused the Petitioner to protect Sarah Lucas[] and that Sarah Lucas killed the victim[.]" In addition, the coram nobis court determined that the "new evidence suggesting Sarah Lucas was involved in the crime[s] does not exclude the Petitioner from participating in the crime[s]." Moreover, the coram nobis court held that while this new impeachment evidence might undermine Sarah Lucas's credibility, impeachment evidence does not support the Petitioner's actual innocence. Lastly, the coram nobis court held that Dr. Neuschatz's report "contain[ed] facts about the Petitioner's interrogation already known by the jury because of the Petitioner's testimony [at trial]" and that this report "d[id] not exclude the Petitioner from the crime[s] or conclude that the Petitioner is innocent." As a result, the coram nobis court held that the evidence attached to the petition did "not clearly and convincingly establish the Petitioner's actual innocence" because "[e]vidence of another person's involvement in the crime fails to demonstrate the Petitioner was not involved" and because it did "not leave this Court free from serious or substantial doubt that the Petitioner did not commit the crimes for which he was convicted." Ultimately, the coram nobis court summarily dismissed the petition as untimely, concluding that the Petitioner had not demonstrated that he was entitled to equitable tolling of the statute of limitations because the Petitioner "failed to allege the existence of newly discovered evidence of actual innocence that would warrant relief under a writ of error coram nobis."

On November 26, 2024, the Petitioner filed a timely notice of appeal of the court's summary dismissal of his amended coram nobis petition.[3] The same date, the Petitioner and the State filed a joint motion for reconsideration of the denial of the coram nobis petition.[4] In this joint motion, the State asserted that it was actively fulfilling its ethical

_____

[3] The Petitioner concedes that the matters raised in his motion to reopen the post-conviction petition are not at issue in this appeal.

[4] As a part of this Joint Motion for Reconsideration, the Petitioner and the State also asked the trial court to reconsider the court's denial of the Motion to Reopen the Post-Conviction Proceedings.

obligations pursuant to Tennessee Rule of Professional Conduct 3.8 by having the Justice Review Unit investigate the Petitioner's conviction based on the new evidence raised in the Petitioner's coram nobis petition, and the State requested that the coram nobis court reconsider its summary dismissal of the coram nobis petition so it could present the court with its investigation findings.

On December 12, 2024, the coram nobis court denied the joint motion for reconsideration, holding that it lacked jurisdiction over the coram nobis petition because the Petitioner filed a notice of appeal, that neither the State nor the Petitioner informed the court of the State's ongoing investigation into the Petitioner's convictions or filed a motion for a status conference, that the State never informed the court of its intent to respond to the Petitioner's pleadings, and that despite "the State's ongoing investigation, the parties ha[d] not provided any new facts indicating that the investigation's results might impact the Court's final analysis[.]".

## ANALYSIS

On appeal, the Petitioner argues that the coram nobis court erred in applying the Clardy standard to toll the statute of limitations. Specifically, he claims the court erred in determining that none of the proof presented in the petition was newly discovered within the meaning of the statute, in improperly equating the facts of the petition with the facts of Clardy to conclude that the petition did not present evidence of actual innocence, in failing to analyze the new evidence in light of all available information of the case, and in conflating the equitable tolling standard with the merits standard. The Petitioner claims that each individual error warrants relief, and when these errors are viewed collectively, they demonstrate the need for Clardy to be clarified for the trial courts. The Petitioner asks this court to reverse the judgment of the coram nobis court, to hold that he is entitled to equitable tolling of the statute of limitations governing his petition, and to remand for an evidentiary hearing on the merits of his newly discovered evidence.

In response, the State asserts that the coram nobis court properly found that the Petitioner was not entitled to equitable tolling of the statute of limitations because he failed to present newly discovered evidence of actual innocence. The State claims that the Petitioner failed to show that this evidence included information that did not exist until after his trial or that this evidence would be admissible. The State also asserts that even if the Petitioner's evidence is taken as true, it is merely cumulative of the proof at trial and would only corroborate or impeach the trial evidence.

A petition for writ of error coram nobis is available to criminal defendants based on subsequently or newly discovered evidence. Tenn. Code Ann. § 40-26-105(a), (b).

However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999); see Payne v. State, 493 S.W.3d 478, 484 (Tenn. 2016). It is "known more for its denial than its approval." Mixon, 983 S.W.2d at 666. The purpose of a writ of error coram nobis "'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. July 19, 1995) (quoting State ex rel. Carlson v. State, 407 S.W.2d 165, 167 (Tenn. 1996)); see Wlodarz v. State, 361 S.W.3d 490, 506 (Tenn. 2012), abrogated on other grounds by Frazier v. State, 495 S.W.3d 246, 248 (Tenn. 2016). Moreover, "[t]he evil that the coram nobis statute is aimed at remedying is a conviction based on materially incomplete or inaccurate information." Payne, 493 S.W.3d at 486. The decision to grant or deny a petition for the writ of error coram nobis rests within the sound discretion of the trial court. Clardy, 691 SW.3d at 400 (citing Payne, 493 S.W.3d at 484).

Coram nobis petitions are governed by Code section 40-26-105(b), which provides:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b). As the statute indicates, coram nobis review is confined to errors outside of the record and to matters that were not and could not have been litigated in the trial, the appeal, or any other type of post-conviction proceeding. Clardy, 691 S.W.3d at 400, n.2 (citing Tenn. Code Ann. § 40-26-105(b)). "The writ may lie for 'subsequently or newly discovered evidence' that relates to matters litigated at the trial only if (1) the defendant shows he was 'without fault in failing to present' the evidence 'at the proper time' and (2) the trial judge finds that presenting the evidence at trial 'may have resulted in a different judgment.'" Id. (quoting Tenn. Code Ann. § 40-26-105(b)). A petitioner is "without fault" if he or she is able to show that "the exercise of reasonable diligence would not have led to a timely discovery of the new information[.]" State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007).

- 17 -

In Tennessee, a petition for writ of error coram nobis may be dismissed on the face of the petition without the need for discovery, an evidentiary hearing, or notification to the opposing party. Nunley v. State, 552 S.W.3d 800, 825 (Tenn. 2018). "Coram nobis petitioners should assume they will get no hearing and that the fate of their case turns on whether the petition demonstrates on its face that they are entitled to the relief sought, including tolling of the statute of limitations." Clardy, 691 S.W.3d at 411 n.18. This rule is consistent with the history of coram nobis petitions and fits with the abuse-of-discretion standard of review for decisions regarding whether to grant coram nobis relief. Nunley, 552 S.W.3d at 825-26.

Given the extraordinary nature of the writ, a coram nobis petition must be pled with specificity. Id. at 829. The Clardy court referenced Justice Koch's concurring opinion in Harris to explain what must be included in a coram nobis petition to meet this specificity requirement:

> The motion or petition must be in writing and (1) must describe with particularity the nature and substance of the newly discovered evidence and (2) must demonstrate that this evidence qualifies as "newly discovered evidence." In order to be considered "newly discovered evidence," the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible. In addition to describing the form and substance of the evidence and demonstrating that it qualifies as "newly discovered evidence," the prisoner must also demonstrate with particularity (3) why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; and (4) how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment.

Clardy, 691 S.W.3d at 400 n.3 (quoting Harris v. State, 301 S.W.3d 141, 152 (Tenn. 2010) (Koch, J., concurring in part and concurring in result) (footnotes and citations omitted)).

In order to be considered "timely," a petition for writ of error coram nobis must be filed within one year of the date the trial court's judgment becomes final. Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 671; see Clardy, 691 S.W.3d at 400. "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris, 301 S.W.3d at 144, overruled in part by Nunley, 552 S.W.3d at 828. Timeliness under the statute of limitations, while not an affirmative defense, is one of the essential elements of a coram nobis claim. Clardy, 691 S.W.3d at 401 (citing Nunley, 552 S.W.3d at 827-28). Accordingly, a coram nobis petition must show on its face that it is timely filed. Id. (citing Nunley, 552 S.W.3d

at 828).  Whether a claim is barred by an applicable statute of limitations is a question of law, which this court reviews de novo.  Harris, 301 S.W.3d at 144.

Due process considerations may require tolling of the statute of limitations for a coram nobis petition.  Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001).  This means that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner."  Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).  Whether due process requires tolling of the statute of limitations is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness.  Clardy, 691 S.W.3d at 401 n.4 (citing Nunley, 552 S.W.3d at 830).

The Clardy court held "the coram nobis statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted."  Id. at 407 (emphasis added) (citations omitted).  In defining this clear and convincing standard, the court concluded that "to toll the coram nobis statute of limitations, the new evidence of actual innocence, if credited, should leave the court with no serious or substantial doubt that the petitioner is actually innocent."  Id. at 408; see State v. Jones, 450 S.W.3d 866, 893 (Tenn. 2014) ("The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.") (citations and internal quotation marks omitted).

The court also held that in assessing a tolling request, the coram nobis court "should first assume arguendo that the new evidence cited in the coram nobis petition is credible, and then determine whether it would clearly and convincingly show that the petitioner 'did not commit the crime.'"  Clardy, 691 S.W.3d at 408 (footnote omitted) (quoting Keen v. State, 398 S.W.3d 594, 612 (Tenn. 2012) (holding that "actually innocent of the offense" means "nothing other than that the person did not commit the crime").  The court emphasized that "[c]oram nobis petitions are 'not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.'"  Id. at 405 n.12 (quoting Nunley, 552 S.W.3d at 831).

The Clardy court also outlined the different standards for timely and untimely coram nobis petitions:

> For a timely petition, if the newly discovered evidence relates to matters that were litigated at trial, the trial judge may grant coram nobis relief if she

"determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. 40-26-105(b). In contrast, if a coram nobis petition "does not show on its face that it is filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that the prisoner is entitled to equitable tolling of the statute of limitations." Nunley, 552 S.W.3d at 829. Those facts must include new "evidence of actual innocence" discovered after the limitations period elapsed. Id. at 828-29.

Id. at 403.

The Clardy court concluded that in light of the "narrow nature of the exception, a prisoner who seeks tolling of the coram nobis statute of limitations must file his petition no more than one year after he discovers the new evidence of actual innocence." Id. at 408. The court asserted that "[t]his standard aligns with the coram nobis statute of limitations, ensures that a convicted person who discovers evidence of actual innocence after expiration of the limitations period will have a reasonable opportunity to present his claim, and protects the interest of the State and of victims in achieving finality in the criminal justice process." Id. at 408-09.

The Clardy court then summarized the equitable tolling analysis:

[I]f a petition for a writ of error coram nobis is not timely filed, and the petition seeks tolling of the one-year statute of limitations, the coram nobis court should first ascertain whether the petition cites new evidence discovered after expiration of the limitations period, and whether the coram nobis petition shows it was filed no more than one year after the petitioner discovered the new evidence. If so, the coram nobis court should assume arguendo the veracity of the new evidence cited in the coram nobis petition, for the purpose of assessing whether to toll the statute of limitations. To grant tolling, the coram nobis court must find that the new evidence would, if credited, clearly and convincingly show that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime. Keen, 398 S.W.3d at 612. If tolling is granted, the coram nobis court may then proceed to address the merits of the coram nobis petition, under the standards in the coram nobis statute, Tennessee Code Annotated section 40-26-105(b).

Id. at 409.

Here, the Petitioner concedes that he filed his coram nobis petition more than one year after the statute of limitations expired. The record shows the trial court entered an order denying his motion for new trial on November 22, 2010; therefore, the Petitioner's statute of limitations expired one year later, on November 22, 2011. However, the Petitioner did not file the instant coram nobis petition until June 25, 2024, more than a decade after the statute of limitations period expired.

Pursuant to Clardy, the coram nobis court, in conducting equitable tolling analysis, was required to review the petition to determine if: (1) it is based on new evidence, (2) the new evidence was discovered after the expiration of the limitations period, (3) the petition was filed within one year after the discovery of the new evidence, and (4) the new evidence, if credited, clearly and convincingly shows that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime. See id. The Petitioner claims he met these four requirements for tolling of the limitations period.

**I. Determination that the Evidence was not "New."** The Petitioner claims the coram nobis court misapplied the Clardy standard in determining that the evidence attached to his petition was not "newly discovered" pursuant to Code section 40-26-105. Specifically, he claims the court erred in concluding that his evidence was not "newly discovered" because it was cumulative to the evidence presented at trial, because it was impermissibly corroborative in nature, because it was impeachment evidence, or because it constituted expert findings. The Petitioner asserts that the coram nobis court's analysis of "new" greatly exceeded the permissible scope of the court's inquiry.

The State responds that the Petitioner cannot show his evidence qualified as "newly discovered." It claims that the Petitioner has failed to show that the declarations in the affidavits of Freddy Brown, Carleigh Balderas, and Tyler Landers, and the statements in the recorded interview with Gracee Landers are admissible because they are hearsay. The State also asserts that Sarah Lucas's police records from Oklahoma and the interview with Teresa Davis are not "newly discovered" because this evidence did not exist at the time of trial. See Clardy, 691 S.W.3d at 400 n.3 (recognizing that "newly discovered evidence" must be "of facts existing, but not yet ascertained, at the time of the original trial"). Lastly, the State contends that Dr. Neuschatz's report is not "newly discovered" because the findings in this report were available to the Petitioner at the time of his trial. See Wlodarz, 361 S.W.3d at 506 (["A] coram nobis petition will not lie where a petitioner was previously aware of the alleged 'newly discovered evidence.'"). We conclude that the Petitioner has failed to show that his petition evidence qualifies as newly discovered evidence.

Notably, "the relief being sought via a writ of error coram nobis 'is the setting aside of the judgment of conviction and the granting of a new trial.'" Payne, 493 S.W.3d at 485 (quoting Harris, 301 S.W.3d at 150 n.8 (Koch, J., concurring in part and concurring in result) (citing Tenn. Code Ann. § 40-26-105(c)). "[A] writ of error coram nobis is the only potential remedy for those rare instances in which a petitioner may otherwise be wrongfully convicted of a crime." Wlodarz, 361 S.W.3d at 504. Therefore, the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial." Payne, 493 S.W.3d at 485 (emphasis added).

"'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware." Id. at 485-86 (emphases added) (citing Tenn. Code Ann. § 40-26-105(b); Harris, 301 S.W.3d at 152 (Koch, J., concurring in part and concurring in result)). Code section 40-26-105(b) provides that the relief obtainable through a writ of error coram nobis is limited "to matters that were not or could not have been litigated on the trial of the case." Tenn. Code Ann. § 40-26-105(b).

We reiterate that "a coram nobis petition will not lie where a petitioner was previously aware of the alleged 'newly discovered evidence.'" Wlodarz, 361 S.W.3d at 506 (citations omitted); Harris, 301 S.W.3d at 160 (Koch, J., concurring in part and concurring in result) (To be considered newly discovered evidence, "the evidence must have been unknown to the defendant at the time of trial."). The coram nobis court must be "reasonably well satisfied" that petitioner was truly "without fault" in obtaining this evidence, that is whether "the exercise of reasonable diligence would not have led to a timely discovery of the new information[.]" Vasques, 221 S.W.3d at 527.

"A narrow exception exists to this requirement, where 'although not newly discovered evidence, in the usual sense of the term,' the availability "of the evidence 'is newly discovered.'" Harris, 301 S.W.3d at 160-61 (Koch, J., concurring in part and concurring in result) (citations omitted). "This narrow exception may be triggered when previously unavailable evidence becomes available following a change in factual circumstances." Payne, 493 S.W.3d at 486. For example, if a witness's testimony is unavailable at trial but later becomes available, such testimony may constitute "newly discovered evidence" even if the Petitioner knew about the witness at the time of trial. Id.; see e.g., Taylor v. State, 171 S.W.2d 403, 404-05 (Tenn. 1943) (applying this narrow exception in a motion for new trial when one witness was in the hospital and another witness was working outside the state on the trial date and both witnesses were later available to testify); Brunelle v. State, No. 2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011) (recognizing that a petitioner could have sought

coram nobis relief when a Department of Children's Services report that was known to the petitioner but sealed at the time of trial later became available).

First, the Petitioner contends that the coram nobis court incorrectly determined that the several pieces of evidence in his coram nobis petition were not "newly discovered" within the meaning of Code section 40-26-105 because they were cumulative to or corroborative of evidence presented at trial. He claims the court erred in determining the following evidence was cumulative: the affidavits from Freddy Brown, Tyler Landers, and Carleigh Banderas; Gracee Landers' interview, Chawonna Jefferson's affidavit, the 2018 letter from Tammy Vance to Sarah Lucas, Sarah Lucas's phone call recording, and Dr. Neuschatz's expert report. Despite the coram nobis court's determination to the contrary, the Petitioner argues that this evidence "presents new, never before heard, facts: namely that [Sarah] Lucas and [Tammy] Vance confessed to Heather Balderas; that because of these confessions, the family members of Lucas and Vance had knowledge of their involvement; that Lucas's addiction may have been the motive for the crime[s]; and that Vance agreed to the take the fall for Lucas as a part of a financial arrangement whereby Lucas was supposed to financially support Vance while she was incarcerated." The Petitioner insists that his ten pieces of petition evidence are newly discovered because they existed at the time of trial, because they were not discovered by him, and because he filed his coram nobis petition within one year of discovering this evidence.

While acknowledging that his petition evidence provided a context for other evidence, particularly Tammy Vance's testimony, the Petitioner asserts that there is a difference between evidence that provides a context for trial proof and evidence that is "merely cumulative" to trial proof or that served "no other purpose than to contradict or impeach." He argues that the coram nobis court erred in determining otherwise.

The Petitioner also asserts that the coram nobis court's finding that his petition evidence was not "new" because it corroborated the proof at trial, was contrary to Wlodarz and Teague when the corroborative evidence, if credited, could have made a difference at trial. See Wlodarz, 361 S.W.3d at 499; Teague v. State, 772 S.W.2d 915, 921-22 (Tenn. Crim. App. 1988). He maintains that in his case, "where two stories of the crime were pitted against each other at trial with little to no corroboration of either side's theory," evidence that supported his testimony and Tammy Vance's testimony "may have resulted in a different judgment had it been presented at trial" pursuant to Code section 40-26-105.

Second, the Petitioner contends that the coram nobis court incorrectly rejected key evidence in the petition on the basis that it was impeachment evidence, and therefore, not new. In particular, he claims the coram nobis court erred in rejecting Freddy Brown's affidavit, Carleigh Balderas' affidavit, Tyler Landers' affidavit, and Gracee Landers' interview as mere impeachment evidence. The Petitioner also asserts that Tammy Vance's

- 23 -

2018 letter and Sarah Lucas's recorded phone call were also erroneously rejected by the coram nobis court because they served to impeach Lucas's trial testimony. The Petitioner claims that his petition evidence is not simply an attack on Sarah Lucas's credibility because this evidence, if taken as true, establishes that Sarah, "a material witness in the original trial, lied about her involvement in a murder, lied about concealing a body, lied about stealing and profiting off of the victim's property, lied about entering into a financial arrangement with her mother to spare herself from consequence, lied about confessing to family members, and lied about sending an innocent man to prison." He claims "[t]hese facts go beyond a credibility issue" because "[t]hey establish [his] innocence." While acknowledging there are individual facts within his petition, which when viewed alone, might be characterized as "mere" impeachment evidence insufficient to toll the statute of limitations, he asserts that the coram nobis court's attempt to characterize "the majority" of his petition evidence as "mere impeachment" proof is error.

The Petitioner claims that his petition evidence concerning Sarah Lucas is "strong," "convincing," and "crucial" to the proof of innocence. See State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) ("[I]f the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered."); see also Evans v. State, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977) (reiterating that "a new trial will not be granted upon the ground of newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness's statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow") (citation omitted).

Third, the Petitioner asserts that the coram nobis court erred in determining that Dr. Neuschatz's report was not "newly discovered" evidence under Clardy. He notes the coram nobis court held that new expert opinions on already presented evidence are not sufficient for error coram nobis relief and that the facts in Dr. Neuschatz's report were not unknown to the Petitioner. The Petitioner claims this holding equated to a conclusion that a coram nobis petitioner may never assert new scientific findings as newly discovered evidence. He maintains that the coram nobis court asked the correct question, "Was the evidence newly discovered?," but answered that question erroneously when it considered whether the petition evidence was cumulative, corroborative, impeachment, or scientific. See Lautenschlager v. State, No. W2024-00582-CCA-R3-ECN, 2024 WL 4815053, at *4 (Tenn. Crim. App. Nov. 18, 2024), perm. app. denied (Tenn. Apr. 17, 2025); Keel v. State, No. M2024-00368-CCA-R3-ECN, 2024 WL 4504425, at *7 (Tenn. Crim. App. Oct. 16, 2024), perm. app. denied (Tenn. Apr. 17, 2025); Alston v. State, No. W2023-00783-CCA-R3-ECN, 2024 WL 3898575, at *8-10 (Tenn. Crim. App. Aug. 22, 2024), perm. app. denied (Tenn. Jan. 23, 2025); Cole v. State, No. W2023-01307-CCA-R3-ECN, 2024 WL

3755828, at *4 (Tenn. Crim. App. Aug. 12, 2024). The Petitioner insists that the nature of Dr. Neuschatz's report, which detailed the interrogation circumstances that could have resulted in a false confession from the Petitioner, was not available to him at trial. He also contends that the inclusion of Dr. Neuschatz's report in his petition was "not simply an attempt to create a battle of the experts."

As support for his claim that Dr. Neuschatz's report is "newly discovered" evidence, the Petitioner argues while the Lowery-Huguely-Richards line of cases held that a newly proffered expert opinion that merely offers a contrary opinion will not constitute "new evidence" under the statute if this expert opinion would not likely change the result at trial, this line of cases does not conclude that "new expert proof is categorically barred." See Lowery v. State, No. E2017-02537-CCA-R3-PC, 2019 WL 2578623, at *21 (Tenn. Crim. App. June 24, 2019) ("The coram nobis statute is limited to provide relief from what may have been an injustice, not to reward a petitioner who had been successful in his search to find new experts who disagree with the previous experts involved in the matter.") (citation and internal quotation marks omitted); Hugueley v. State, No. W2016-01428-CCA-R3-ECN, 2017 WL 2805204, at *14 (Tenn. Crim. App. June 28, 2017) (same); cf. State v. Richards, No. E2022-01468-CCA-R3-CD, 2024 WL 4142596, at *43 (Tenn. Crim. App. Sept. 11, 2024) (concluding on direct appeal that expert opinion testimony was not "newly discovered evidence" because this testimony was offered for the purposes of discrediting or contradicting another expert's opinion on the items tested), perm. app. denied (Tenn. Apr. 17, 2025). The Petitioner asserts that he had no expert at trial to explain the psychology behind why an innocent person might confess to a murder he did not commit. He maintains that Dr. Neuschatz's report directly relates to the "sole evidence" of his guilt, namely his confession, and that Dr. Neuschatz's report "does more than merely contradict or comment on trial evidence" because it attacks his confession. The Petitioner insists that "[w]hether [his] confession is reliable or unreliable is so central to the issue of guilt or innocence that it deserves to be heard." He also maintains that if the jury had heard the evidence in Dr. Neuschatz's report, it may have made a difference at his trial. See Tenn. Code Ann. § 40-26-105(b).

Lastly, the Petitioner claims the coram nobis court misidentified Dr. Neuschatz's report as coerced confession evidence, which was obviously known to the Petitioner at trial, rather than as Dr. Neuschatz's findings, which incorporated new scientific developments shedding light on the circumstances that result in coerced confessions that were not presented at trial. Cf. Richards, 2024 WL 4142596, at *43. Consequently, he argues that Dr. Neuschatz's report qualifies as "newly discovered" evidence.

We will now evaluate the ten pieces of petition evidence to determine whether they constitute "newly discovered" evidence pursuant to Code section 40-26-105(b):

- 25 -

**A. Freddy Brown's Affidavit:** We conclude that the affidavit of Freddy Brown, the live-in boyfriend of Heather Balderas and Sarah Lucas's brother, is not "newly discovered" evidence because the facts contained therein were known to the Petitioner at the time of trial. In this affidavit, Brown states that he heard Heather Balderas, John Vance, and other members of Heather's family state that Sarah was responsible for the victim's murder. He said Heather told him that there was an arrangement between Tammy and Sarah, whereby Tammy accepted responsibility for the victim's murder in exchange for Sarah taking care of Tammy financially while she was in prison. Brown also stated Heather told him that Sarah and Tammy committed the murder together, that a hammer was the murder weapon, and that they committed murder to obtain money for Sarah's crack cocaine addiction. We conclude that Tammy's testimony, along with other proof presented at the Petitioner's trial, revealed the same facts as those contained in Brown's affidavit. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

Furthermore, the Brown affidavit references Sarah's 2022 letter to Heather with the photograph of the victim and Brown's 2017 to 2022 observations of Sarah's quick temper. These facts were not "newly discovered" because they did not exist at the time of the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); see also Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial) (emphasis added)).

**B. Tyler Landers's Affidavit:** We conclude that the affidavit of Sarah Lucas's nephew, Tyler Landers is not "newly discovered" evidence. This affidavit shows Tammy's 2021 letter to Heather Balderas was not "newly discovered" evidence because the facts contained therein were known to the Petitioner at the time of his trial. In this affidavit, Landers stated that Tammy's letter to Heather indicated that Tammy and Sarah were responsible for the victim's murder, that Tammy and Sarah took the victim's truck, that sometime after the victim's murder, Tammy and Sarah returned to the victim's home and stole his television, checks, and money, and that Sarah "poured kerosene or something" on the victim to prevent the victim's body from smelling. We note that at trial, Tammy's testimony, as well as other evidence presented, revealed the same facts as those contained in Landers's affidavit. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

- 26 -

Lastly, we conclude that Landers's 2022 observations of Sarah's violent tendencies, Sarah's nervousness at the mention of the victim's murder, Sarah's drug usage and failure to take her bipolar medication, and Sarah's claim that she would "get away" with slashing her husband's throat during argument are not "newly discovered" because these facts did not exist at the time of the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial)(emphasis added)).

C. **Carleigh Balderas's Affidavit:** The affidavit of Sarah Lucas's niece, Carleigh Balderas is not "newly discovered" evidence because the facts in this affidavit were known to the Petitioner at the time of trial. In her affidavit, Carleigh stated that Heather Balderas told her that Tammy and Sarah were responsible for the victim's death and that Sarah "poured bleach" on the victim before taking his truck. The jury heard proof of these same facts at trial. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

Moreover, Carleigh's observations about Heather Balderas's and Sarah Vance's volatile relationship, Sarah's harassment of Heather, and Sarah's failure to put money on Tammy's prison account are not "newly discovered" because these facts did not exist at the time of the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial)(emphasis added)).

D. **Gracee Balderas's Interview:** We conclude that the Tennessee Innocence Project's interview with Gracee Balderas is not "newly discovered" evidence, in part, because most of these facts were known to the Petitioner at the time of trial. During this interview, Gracee stated that Tammy pawned the victim's belongings and used his truck, that Heather told her that Tammy and Sarah were responsible for the victim's death, that one of them poured bleach down the victim's throat, that Sarah bashed the victim's head in with a hammer, that efforts were made to reduce the smell of the victim's decomposing body, and that the Petitioner had no part in the victim's death. The jury heard proof of these same facts at trial. Evidence was presented at trial indicating that the victim's deceased body was covered in cleaning chemicals and kept at a cool temperature to reduce its smell, that Tammy used the victim's truck and pawned the victim's things, that Sarah

and Tammy were placed at the victim's home shortly before his death, that Sarah bashed the victim's head in with a hammer, that Tammy "covered" for Sarah when she confessed to the victim's murder, and that several family members of Tammy and Sarah believed that the Petitioner had no part in the victim's death. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

The remaining facts disclosed during this interview, including Tammy's death in prison, Tammy's sending a letter with a photograph of the victim to Heather Balderas, Sarah's illegal drug use and abusive nature toward Gracee and other family members, Sarah's failure to take her bipolar medicine around Gracee, and Sarah's behavior toward Tammy many years after the victim's death, are not "newly discovered" because they did not exist at the time of the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial)(emphasis added)).

**E. Chawonna Jefferson's Affidavit:** We conclude that the affidavit of Chawonna Jefferson, the Petitioner's former girlfriend, is not "newly discovered" evidence. This is because all of the facts in Chawonna Jefferson's affidavit were known to the Petitioner at the time of his trial: that Tammy and Sarah rented a room in Snow Jefferson's home, that Tammy had an injury on her forehead from a man who she claimed hit her and then checked himself into "rehab," that Tammy and Sarah used the victim's truck, that the victim's cell phone belonged to Tammy and Sarah, that the Petitioner did not receive the victim's cell phone for taking part in the crime, that Chawonna never observed the Petitioner return home with blood on his clothing or body, that the Petitioner never told Chawonna about the victim or about traveling to the victim's home to commit a crime, that Chawonna had no knowledge that the Petitioner knew the victim or that the Petitioner was involved in the charged offenses, that the police employed aggressive and intimidating tactics during Chawonna's interrogation, that the Petitioner admitted to the charged offenses after an overnight police interrogation, that the Petitioner had trouble reading and writing, that the police did not allow Chawonna to talk to the Petitioner at the station, that Chawonna believed she and the Petitioner were caught up in this case because Snow Jefferson was a confidential informant looking to make money when she told the police about the victim's stolen truck, that Chawonna was allowed to return home because she maintained her innocence, that the Petitioner always maintained his innocence to Chawonna, and that the Petitioner's statement to police was the only thing connecting him to these crimes. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that

existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

Although the Petitioner claims that Chawonna's affidavit contradicts the State's theory at trial that the Petitioner received this cell phone as compensation for his participation in the victim's murder, the jury heard proof that Tammy and Sarah left behind a cell phone, heard evidence concerning the circumstances of his interrogation, heard the Petitioner's testimony that he falsely confessed, and heard Snow's testimony that she never saw the Petitioner in possession of any of the victim's property.

F. **Tammy Vance's 2018 letter to Sarah Lucas:** We conclude that the 2018 letter written by Tammy Vance to Sarah Lucas is not "newly discovered" evidence because the facts in this letter were known to the Petitioner at the time of trial. In this letter, Tammy claims that she protected Sarah from going to prison and let an innocent man take her place. At trial, Tammy testified that the Petitioner was not involved in the victim's death. During her trial testimony, Tammy inculpated Sarah in the victim's death but claimed she pled guilty to prevent Sarah Lucas from going to prison and that she implicated the Petitioner, even though he was innocent of the charged offenses in this case. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added).

G. **Oklahoma Police Records**: We fully agree with the State that the police records from Oklahoma are not "newly discovered" because the facts in these records did not exist at the time of the Petitioner's trial. These records concern offenses, mainly involving Sarah's threats, harassment, and thefts, that occurred during the period from 2022 to 2023, many years after the date of the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.") (emphasis added)).

H. **Teresa Davis's Interview:** We conclude that the Tennessee Innocence Project's interview with Teresa Davis is not "newly discovered" evidence because the facts disclosed during this interview concerned Billy Davis's suicide, which occurred in 2023, several years after the Petitioner's trial. See Clardy, 691 S.W.3d at 400 n.3 (stating that "newly discovered evidence" must be "evidence of facts existing, but not yet ascertained, at the time of the original trial"); Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense

with which he was charged based on all of the evidence that should have been made available to the fact-finder <u>at the initial trial</u>)(emphasis added)).

**I. <u>Sarah Lucas's recorded phone call:</u>** We conclude that the Tennessee Innocence Project's recorded phone call with Sarah Lucas is not "newly discovered" evidence because the facts contained therein were known to the Petitioner at the time of trial. In this call, Sarah denied any involvement in the victim's murder and asserted that Tammy implicated her in the victim's murder at trial because Sarah refused to give her money while she was in prison. This is consistent with Sarah's trial testimony. <u>See</u> Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that <u>existed at the time of trial</u> but of which the <u>defendant, through no fault of his own, was unaware.</u>") (emphases added).

**J. <u>Dr. Neuschatz's Expert Report:</u>** We conclude that the expert report from Dr. Jeffery Neuschatz is not "newly discovered" evidence. This court has consistently concluded, within the context of error coram nobis cases, that a new expert opinion on previously presented evidence does not constitute newly discovered evidence. <u>See</u> <u>Lowery</u>, 2019 WL 2578623, at *21 (concluding that new testimony from two experts did not constitute newly discovered evidence for the purpose of error coram nobis relief because these new experts simply "disagreed with the expert witnesses who testified at trial" and their new expert testimony "serve[d] no other purpose than to contradict or impeach the evidence adduced during the course of the trial"); <u>see also</u> <u>Garrett v. State</u>, No. M2017-01076-CCA-R3-ECN, 2018 WL 1976358, at *10 (Tenn. Crim. App. Apr. 26, 2018) (observing that new expert opinions "on already-presented evidence" do not constitute newly discovered evidence sufficient for error coram nobis relief); <u>Hugueley</u>, 2017 WL 2805204, at *14 ("The coram nobis statute is intended to provide relief from what may have been an injustice, not to reward a petitioner who has been successful in his search to find new experts who disagree with the previous experts involved in the matter.").

We conclude that Dr. Neuschatz's report is simply a new expert opinion on the evidence presented at trial concerning the details of the Petitioner's interrogation and subsequent confession. The Petitioner has failed to identify any alleged advances in research and science that Dr. Neuschatz relied upon that were not available at the time of his trial. Notably, the Petitioner never claims that expert testimony about confessions was not available at the time of his trial, likely because his trial counsel admitted that he had planned to hire a "confession expert" initially. <u>See</u> <u>Hayes II</u>, 2017 WL 2805205, at *5. In addition, the Petitioner never explained why he did not call an expert to testify about his confession at trial. Accordingly, we conclude that the Petitioner cannot establish that Dr. Neuschatz's report is newly discovered evidence. <u>See</u> <u>Moore v. State</u>, No. W2015-00626-CCA-R3-ECN, 2015 WL 6873181, at *3 (Tenn. Crim. App. Nov. 6, 2015) (holding that an expert's affidavit was not "newly discovered" evidence when this expert was available

- 30 -

to testify at trial and the petitioner "failed to explain why he did not call the expert witness to testify at trial in response to the State's expert").

Moreover, we conclude that the report of Dr. Neuschatz is not newly discovered evidence within the meaning of the coram nobis statute because the Petitioner was aware of the facts contained within this report at the time of his trial. In other words, the Petitioner was well aware of the issues concerning his interrogation at the time of trial. See Payne, 493 S.W.3d at 485-86 ("'[N]ewly discovered evidence' refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware.") (emphases added). The Petitioner argued in an unsuccessful pretrial motion to suppress that his confession was involuntary and the result of coercion. Hayes I, 2012 WL 3192827, at *10-13. It is well established that a coram nobis petition is not the correct vehicle for relitigating a suppression motion. See Jefferson v. State, No. M2024-00756-CCA-R3-ECN, 2015 WL 2128606, at *8 (Tenn. Crim. App. May 6, 2015) (stating that because the denial of the motion to suppress was affirmed on appeal, the validity of confessions is no longer an issue that will afford the petitioner coram nobis relief); Willis v. State, No. E2015-00235-CCA-R3-ECN, 2016 WL 3753738, at *14 (Tenn. Crim. App. July 7, 2016) (holding that because the petitioner's "confession was deemed admissible, he may not seek coram nobis relief on this basis"). The Petitioner provided extensive testimony at trial that the conditions of his interrogation resulted in a false confession, and the jury heard testimony from two officers concerning the details of the Petitioner's interview. Hayes I, 2012 WL 3192827, at *4-6, *8-9. The Petitioner then included this issue in his direct appeal, but this court concluded that his confession was not coerced. Id. at *13. He also argued in his unsuccessful post-conviction petition that trial counsel was ineffective in failing to obtain a mental health expert and a confession expert for trial, and this court held that the Petitioner failed to establish that he was prejudiced by trial counsel's failure to obtain such experts. Hayes II, 2017 WL 2805205, at *7. For all these reasons, we conclude that Dr. Neuschatz's report is not "newly discovered" evidence.

After careful evaluation, we conclude that the Petitioner's ten pieces of petition evidence do not constitute newly discovered evidence. We fully agree with the coram nobis court's conclusions that the petition evidence either consists of proof that was known to the Petitioner at the time of trial or proof that did not exist at the time of his trial. However, in the event of further appellate review concluding that some or all of the petition evidence is "newly discovered," we will consider the remaining issues raised by the Petitioner.

**II. <u>Weighing of the Proof at Trial against the Evidence in the Petition.</u>** The Petitioner claims that the coram nobis court erred in weighing the evidence at trial, the exculpatory evidence that was not presented at trial, and the new evidence in contravention

of <u>Clardy</u>.[5]  He notes that although <u>Clardy</u> provided no specific guidance regarding the scope and manner of review when considering the new evidence against the complete record of prior proceedings, he agrees that "the coram nobis court in <u>Clardy</u> considered facts and conclusions reached in prior proceedings and weighed the new evidence against the evidence supporting the conviction."  The Petitioner asserts that although the coram nobis court claimed it would not review his "new" evidence in a vacuum, but would review it in light of the complete trial record in this case, the court ultimately gave undue weight to the evidence presented at trial, failed to consider the credibility of the facts adduced at trial in light of his "new" evidence, failed to consider the evidence favorable to him in the record, failed to consider exculpatory evidence not presented at trial, and weighed each piece of evidence in a vacuum, despite its promise not to do so.  The State responds that the coram nobis court's consideration of and weighing of the proof presented in the Petitioner's case were consistent with <u>Clardy</u>.  We agree with the State.

While the <u>Clardy</u> court did not explicitly identify what evidence should be considered by a coram nobis court or appellate court when determining whether the new petition evidence meets the standard of clear and convincing, it did declare that the analysis by the coram nobis court in <u>Clardy</u> was "spot on."  691 S.W.3d at 411.  In <u>Clardy</u>, the coram nobis court noted that the ballistic evidence had already been the subject of post-conviction proceedings, which "terminated in an appellate finding that the ballistics evidence suggested Dantwan Collier or Thomas Collier might have been involved but did not show Clardy was <u>not</u> involved" in these crimes.  <u>Id.</u> (citing <u>Clardy</u>, 2018 WL 5046032, at *7).  The coram nobis court then determined that the only "new" evidence presented in the coram nobis petition was Dantwan Collier's affidavit, which stated that he did not know the petitioner and had never received any property from the petitioner.  <u>Id.</u> at 397.  After taking the assertions in Dantwan Collier's affidavit as true, the coram nobis court concluded that this affidavit did not "seriously undermine" Clardy's involvement in the offense and dismissed the coram nobis petition as untimely without addressing the merits of the petition under Code section 40-26-105(b).  <u>Id.</u>  On review, the <u>Clardy</u> court fully agreed with the coram nobis court's assessment of Clardy's new evidence:

> As noted in the post-conviction proceedings, the ballistics evidence did not show Clardy was not in possession of the firearm when the underlying crime was committed.  <u>Clardy</u>, 2018 WL 5046032, at *7.  The Dantwan Collier affidavit did not change that.  The new evidence cited by Clardy in his coram nobis petition would not, if credited, clearly and convincingly show Clardy is actually innocent of the underlying crime, i.e., he did not commit the crime.  <u>Keen</u>, 398 S.W.3d at 612.

---

[5] We have reordered the Petitioner's issues for clarity.

- 32 -

Id. at 411-12. The court then held that Clardy had "failed to present in his petition new evidence of actual innocence discovered after the expiration of the limitations period" and had "failed to establish he was entitled to tolling of the coram nobis statute of limitations." Id. at 412. Significantly, the Clardy court considered both the evidence that was presented in a prior proceeding, i.e., the ballistic evidence, and the post-conviction appellate court's conclusions regarding this ballistics evidence before the Clardy court weighed the new petition evidence of Dantwan Collier's affidavit against the proof supporting Clardy's conviction. Id. at 398, 411.

First, the Petitioner asserts that if his petition evidence eliminates the reliability of the proof that led to his conviction, the coram nobis court should have taken that into account when giving "great weight to the facts adduced at trial." He claims the coram nobis court, relying on Workman v. State, 41 S.W.3d 100 (Tenn. 2001), credited the evidence of guilt presented at trial but failed to credit evidence of innocence presented at trial and failed to credit his petition evidence "where it directly refute[d] the trial evidence." The Petitioner claims this misbalanced weighing analysis is at odds with Clardy and coram nobis case law. See Clardy, 691 S.W.3d at 408 ("[T]o toll the coram nobis statute of limitations, the new evidence of actual innocence, if credited, should leave the court with no serious or substantial doubt that the petitioner is actually innocent."). The Petitioner also contends that the coram nobis court should have "review[ed] the evidence of guilt in light of" his petition evidence and should have compared the strength of the petition evidence against the strength of the evidence of guilt presented at trial. Lastly, the Petitioner asserts that the coram nobis court should have considered whether the evidence presented at trial could corroborate his petition evidence when conducting a tolling analysis.

As an example, the Petitioner claims that the coram nobis court erred in dismissing Chawonna Jefferson's statements about the cell phone, stating, "[T]he fact that the Petitioner did not possess the victim's cell phone does not support his actual innocence since his confession and the corroborating evidence placed him in the victim's apartment during the murder." He argues that while the coram nobis court concluded that his petition evidence refuting the cell phone was irrelevant given the other corroborating evidence of guilt, namely the Petitioner's confession, the court later referenced the victim's cell phone when it needed corroborating evidence, specifically claiming that the Petitioner's conviction was corroborated by crime scene evidence, medical examiner's testimony, and eyewitness testimony that he possessed the victim's property after the victim's death." The Petitioner claims that "[t]his type of circular argument permeates the Order and is the result of the court failing to analyze the new evidence as a whole," which is inconsistent with Clardy.

- 33 -

Regarding this issue, we recognize that the coram nobis court, in referencing the victim's property, did not identify the property at issue as the victim's cell phone. Significantly, the proof at trial established that the Petitioner possessed the victim's television following the victim's death. Accordingly, we conclude that the coram nobis court did not utilize circular reasoning in relying on the Petitioner's possession of the victim's television, along with other evidence presented at trial, to corroborate the Petitioner's conviction.

The Petitioner also maintains that the trial court's continued reliance on his confession to corroborate his guilt is "misplaced given the new evidence that refutes its reliability." He asserts that pursuant to Clardy, the court must credit the new evidence during its tolling analysis, so the court's reliance on his confession is contrary to the directive to credit the new evidence, which discounts his confession. In other words, the Petitioner argues that the coram nobis court "seems to be simultaneously giving 'great weight' to the evidence at trial that convicted [him] yet is unwilling to analyze that evidence in light of either the trial record that is favorable to [him] or new evidence that indeed casts great doubt on 'the facts adduced at trial.'"

Here, the coram nobis court recognized that the Clardy court "considered facts and conclusions reached in prior proceedings and weighed the new [petition] evidence against the evidence supporting the conviction." In addition, the coram nobis court stated that it would not review the new evidence presented by the Petitioner "in a vacuum but in light of the trial record in this case."

The Clardy court specifically recognized that a guilty verdict "has the effect of crediting the testimony of the witnesses for the State, resolving all conflicts in favor of the State, and replacing the presumption of innocence the defendant had at trial with a presumption of guilt." Id. at 406. It also noted that "as time goes on and the convicted defendant exhausts the many remedies available to him, the State's interest in the finality of the conviction becomes weightier." Id. Given Clardy's guidance, we conclude the coram nobis court properly placed "great weight" on "the facts adduced at trial." Specifically, the coram nobis court found that the "crime scene evidence[,] medical examiner testimony, and eyewitness testimony that [the Petitioner] possessed the victim's property after the victim's death" were corroborative proof that the Petitioner was guilty. Despite the Petitioner's claims, the record establishes that the coram nobis court did not weigh each piece of evidence in a vacuum; instead, the court properly assumed the petition evidence was true and then weighed it against the proof presented at trial while giving "great weight to the facts adduced at trial." Accordingly, we conclude that the coram nobis court properly considered and weighed the proof presented at trial consistent with Clardy.

- 34 -

Second, the Petitioner contends that the coram nobis court erred when it ignored the exculpatory evidence in his petition when conducting its tolling analysis. He asserts that the following exculpatory information was in the State's files but was never presented to the jury: the victim's cell tower data the day of his death, the victim's cell phone records the day of his death and in the subsequent weeks, the victim's bank records, the fingerprint evidence on the victim's stolen check, and the pawnshop records. He asserts that although this exculpatory information may not be "newly discovered" in the sense that it may not be suitable on its own to bring a coram nobis petition, this exculpatory evidence is "part of the story of the case," "would be admissible at a new trial," and "would be admissible in the credibility determination."

The Petitioner asserts that the above exculpatory information proves the validity of Tammy's testimony that the victim was with Tammy and Sarah the morning of his death; that multiple calls from the victim's phone to Heather Balderas were placed within minutes of the victim's death; that whoever had the victim's phone spoke to Heather Balderas from the crime scene for five minutes after the victim's death; and that Sarah lied about her whereabouts on August 20, 2007, lied about her involvement in the victim's murder, and lied about whether she profited from the victim's property. The Petitioner argues that this exculpatory evidence, particularly when paired with his petition evidence, shows that he is innocent of the charged crimes and that Sarah is responsible for the victim's murder. However, the Petitioner complains that the coram nobis court afforded this exculpatory evidence only "a few brief sentences in a footnote of its Order."

The Petitioner insists that Clardy encourages the coram nobis court to consider exculpatory evidence like that included in his petition. See id. at 411 (specifically considering the ballistics evidence, which suggested Dantwan Collier or Thomas Collier as alternate suspects, in its tolling analysis because the appellate court had already held during the post-conviction appeal that although the ballistic evidence suggested that Dantwan Collier or Thomas Collier may have been involved, it did not show that Clardy was not involved); Johnson v. State, 370 S.W.3d 694, 701 (Tenn. Crim. App. 2011) (holding that "when determining whether error coram nobis relief was warranted, the newly discovered evidence should be considered in light of the evidence introduced at the trial and the improperly withheld exculpatory evidence that this court previously determined should have been made available for use at the trial") (emphasis added).

The Petitioner maintains that the exculpatory evidence in his petition qualifies as "other information" offered at the coram nobis proceeding as conceived by Vasques, 221 S.W.3d at 527, even if it differs from Clardy and Johnson in that this exculpatory evidence

has not yet been presented to a court.[6] The Petitioner insists that it "should be more important that we get the substantive question of innocence correct by considering—not ignoring—the evidence of innocence."

Despite the Petitioner's claim to the contrary, the Tennessee Supreme Court in Vasques only considered the "new" evidence in the coram nobis petition and the proof presented at trial and did not consider "other information" offered at the coram nobis proceeding. See id. (holding that "in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity" and that "[i]f the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result"). Moreover, Clardy and Johnson clearly stand for the proposition that evidence considered by an appellate court in prior proceedings may be reviewed in determining whether to toll the coram nobis statute of limitations. See Clardy, 691 S.W.3d at 411; Johnson, 370 S.W.3d at 701. Here, unlike in Johnson, there is no allegation that the Petitioner's allegedly "exculpatory" evidence was erroneously withheld and, therefore, should be considered in determining whether the statute of limitations should be tolled. Because the Petitioner's allegedly exculpatory evidence was not withheld and could have been utilized by the Petitioner at the time of his trial, the coram nobis court properly held that this evidence, which was not "newly discovered," should not be considered in its analysis regarding the tolling of the statute of limitations. Accordingly, the Petitioner is not entitled to relief on this issue.

Third, the Petitioner claims that the coram nobis court erred in not considering the petition evidence as a whole when it conducted its Clardy tolling analysis. He states that although the coram nobis court recognized that it should not review the Petitioner's new evidence "in a vacuum," the court did exactly that by analyzing "each piece of new evidence in a vacuum rather than in concert and context with the entire record and story of the case." The Petitioner asserts that the record is "devoid of evidence that the [coram nobis] court analyzed the newly discovered evidence, as a whole, against the entire story of the case" and that if it had, "the statute of limitations would have been tolled." He asserts that the coram nobis court "made individual findings with regard to each piece of evidence" but "did not make any findings as to the implications of the totality of the evidence."

---

[6] The Petitioner asserts that although this exculpatory evidence was not admitted at trial, it "would be admissible at a future coram nobis proceeding to question witnesses about their whereabouts and actions on August 20, 2007."

The Petitioner specifically takes issue with the coram nobis court's determination that Dr. Neuschatz's report was "not evidence of actual innocence" because on its own, the report did "not show the Petitioner did not commit the crime." He asserts that when making this determination, the coram nobis court failed to take any other evidence of his innocence into account. He maintains that Clardy does not require that each individual piece of evidence must, on its own, satisfy the tolling requirement. See Clardy, 691 S.W.3d at 409. The Petitioner claims that the only time the coram nobis court employed any such language concerning the totality of the evidence, it erred by connecting it to a merits analysis rather than a tolling analysis when it held, "[W]hen viewed as a whole, the new evidence has little to no impact on the evidence of conviction."

Despite the Petitioner's claims to the contrary, the record shows that the coram nobis court did not weigh each piece of petition evidence in a vacuum. Even though the coram nobis court determined that none of the petition evidence was "newly discovered," the court nevertheless assumed the petition evidence was true before it weighed this evidence against the proof presented at trial, properly giving "great weight to the facts adduced at trial." The coram nobis court's weighing of the proof in this case is consistent with Clardy's recognition that "as time goes on and the convicted defendant exhausts the many remedies available to him, the State's interest in finality of the conviction becomes weightier." Clardy, 691 S.W.3d at 406. Because the record shows the coram nobis court properly weighed the petition evidence against the proof supporting the Petitioner's conviction, as is required by Clardy, the Petitioner is not entitled to relief on this issue.

**III. Court's Determination that the Petition did not Present Evidence of Actual Innocence.** Next, the Petitioner argues that the coram nobis court improperly "mapped the facts of Clardy" onto the facts of his petition when it determined that the petition did not present evidence of his actual innocence. He claims the coram nobis court erroneously determined that much of the petition evidence was not evidence of the Petitioner's actual innocence, which stemmed from the court's beliefs that (1) several individual pieces of new evidence, on their own, did not demonstrate that the Petitioner is actually innocent of the crimes, and (2) the new evidence of Sarah Lucas's involvement did not exclude the Petitioner from participating in the crime. He claims these conclusions are not supported by the petition evidence or the analytical framework in Clardy.

The State responds that even if we assume that the petition evidence is true, this evidence fails to establish the Petitioner's actual innocence. It claims the petition evidence was either cumulative to the proof presented at trial or served only to corroborate or potentially impeach the proof at trial. Consequently, the State contends that the coram nobis court properly determined that the petition evidence, when considered along with the proof at trial, falls "well short of clear and convincing proof that [the Petitioner] did not commit the offense[s]." We agree with the State.

First, the Petitioner argues that the trial court mischaracterized the petition evidence to determine that it was not evidence of "actual innocence." He claims that although the facts in Clardy lent themselves to the question of whether the new evidence excluded the Petitioner, the facts in the instant case do not. The Petitioner reiterates that pursuant to Clardy, "the coram nobis court should assume arguendo the veracity of the new evidence cited in the coram nobis petition, for the purposes of assessing whether to toll the statute of limitations." Clardy, 691 S.W.3d at 409. He claims that unlike in Clardy, where witnesses asserted there were three perpetrators and could only identify one of them, in the instant case, he brought forth multiple witnesses that "establish[ed] the same version of facts—none of which involve[d] [the Petitioner] as a participant in the murder." He claims that the evidence attached to his petition does more than "undermine" his involvement in the crimes, it "rules [him] out." See Clardy, 691 S.W.3d at 398.

The Petitioner insists that his petition evidence does not say that Sarah and the Petitioner killed the victim; instead, he claims the petition evidence shows that Sarah and Tammy, "together and alone, killed [the victim], that they "stole [the victim's] property," that they "returned to the scene of the crime to conceal [the victim's] body," that they "concocted an agreement for [Tammy] to take the blame in exchange for monetary assistance from [Sarah]," that Sarah "told her family that she will not face consequences [for killing the victim]," and that "an innocent man is serving a life sentence in place of [Sarah] for a crime he did not commit." The Petitioner contends that "the Tennessee Supreme Court's analysis in Clardy was not intended to prevent evidence of this nature from, at a minimum, receiving a hearing to assess its credibility."

We agree with the State that the substance of the petition evidence is identical to proof presented to support the Petitioner's defense at his trial, namely that Tammy and Sarah were responsible for the victim's murder, that the Petitioner was not involved, and that the Petitioner's confession was coerced and unreliable. Although the Petitioner actively presented proof supporting these defenses at his trial, the jury rejected these defenses and convicted the Petitioner. Because the petition evidence does not fundamentally strengthen the Petitioner's defenses, we conclude that the trial court did not mischaracterize the petition evidence when it held that it did not establish the Petitioner's "actual innocence."

Second, the Petitioner contends that the court mischaracterized other petition evidence to erroneously conclude that it inculpated the Petitioner. He claims the coram nobis court misinterpreted Sarah's statement during the recorded phone call that "[the Petitioner] did what he did" to mean that the Petitioner murdered the victim rather than that the Petitioner falsely confessed to the crime. The Petitioner insists that Sarah repeatedly stated on the recording that she did not have any knowledge about the Petitioner's

involvement in the victim's death even though she was not truthful about her own involvement in the victim's murder. He contends that Clardy directs courts to presume the credibility of the new evidence when conducting the tolling analysis but does not invite courts to selectively analyze the evidence to "come up with a new, unpresented theory of the case." He argues that the petition evidence, when taken as true, "categorically excludes" him from participating in the crimes. He also argues that "[f]or the court to suggest otherwise was a misunderstanding of the directive under Clardy."

In Clardy, Tennessee Supreme Court fully agreed with the coram nobis court's decision that the newly discovered evidence of Dantwan Collier's affidavit did not "'rule out or even seriously undermine' Clardy's involvement in the underlying crime." Id. In reaching this conclusion, the court noted that "as time goes on and the convicted defendant exhausts the many remedies available to him, the State's interest in finality of the conviction becomes weightier." Id. at 406. Consequently, the Clardy court concluded that there should be a high threshold for tolling the coram nobis statute of limitations:

> For this reason, the tolling exception to the statute of limitations for writs of error coram nobis should be no broader than is needed to accommodate the requirements of due process. After all, the relief sought by a writ of error coram nobis is the setting aside of the conviction and the granting of a new trial, Payne, 493 S.W.3d at 485, and for a petition that seeks tolling of the statute of limitations, this may be many years down the road. We know that "the passage of time only diminishes the reliability of criminal adjudications." Herrera [v. Collins], 506 U.S. [390,] 403 [(1993)]. Because of the "very disruptive effect" that litigating claims of actual innocence would have on the need for finality in criminal cases, and the "enormous burden that having to retry cases based on often stale evidence" would place on the State, id. at 417[], the threshold for tolling the coram nobis statute of limitations should be high.

Id. at 407.

Pursuant to the holding in Clardy, we will not review the new evidence presented by the Petitioner in a vacuum but will consider it against the proof supporting the Petitioner's convictions. See Clardy, 691 S.W.3d at 411. While the Petitioner repeatedly insists that his confession is the only evidence of his guilt, on direct appeal, the Tennessee Court of Criminal Appeals concluded that the evidence presented at trial "more than sufficiently established the defendant's guilt of felony murder and aggravated robbery." Hayes I, 2012 WL 3192827, at *14. Specifically, this court pointed to the following proof in determining that the evidence was sufficient to sustain the Petitioner's convictions:

Here, the jury obviously accredited the defendant's pretrial statements confessing the victim's murder in graphic detail as well as the testimony of the officers who took those statements and found the defendant's in-court denials less than credible. The defendant admitted to police that he entered the victim's apartment along with [Tammy] Vance with the intent to rob him and ended up killing him by striking him seven or eight times with a metal pipe. The evidence at the scene, the condition of the body, and the medical examiner's description of the victim's injuries corroborated the defendant's confession of murder. Other witnesses testified that they saw the defendant with property belonging to the victim in the months following the victim's death, corroborating his admission that robbery was the motive for the victim's death. Although Ms. Vance testified on the defendant's behalf that [Sarah] Lucas had murdered the victim, the jury, as was its prerogative, rejected this testimony. The evidence adduced at trial more than sufficiently established the defendant's guilt of felony murder and aggravated robbery.

Id.

We agree that at the conclusion of the Petitioner's trial, the jury found him guilty based on his confession as well as the corroborating proof, consisting of the testimony of the interviewing officers, the crime scene evidence, the condition of the victim's body, the medical examiner's testimony, and the eyewitness testimony that the Petitioner possessed the victim's property shortly after the victim's death, which supported a motive of robbery for the victim's death. The Petitioner presented testimony from Tammy Vance, who stated that the Petitioner was not involved in the victim's murder and that her daughter Sarah Lucas was responsible for the victim's death. Sarah Lucas testified that she had no knowledge of the Petitioner's involvement in the victim's murder. Ultimately, the jury rejected all proof exonerating the Petitioner, as was its prerogative.

In the first section of this opinion, we concluded that none of the Petitioner's petition evidence constituted "newly discovered" evidence. However, in the event of further appellate review concluding that some or all of the petition evidence is "newly discovered," we will consider whether the petition evidence "would, if credited, clearly and convincingly show that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime." Clardy, 691 S.W.3d at 409 (citing Keen, 398 S.W.3d at 612). Regarding the clear and convincing standard, the Clardy court held:

To meet the clear and convincing standard, the trial court must determine that the evidence offered . . . is not vague and uncertain. The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that there [be]

no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

Id. at 408 (quoting Jones, 450 S.W.3d at 893). Accordingly, "the new evidence of actual innocence, if credited, should leave the [coram nobis] court with no serious or substantial doubt that the petitioner is actually innocent." Id.

Here, the coram nobis court found that "assuming the evidence presented by the Petitioner is true, it does not equate to actual innocence." Specifically, the coram nobis court concluded:

> Accordingly, [when] viewed as a whole, the new evidence has little to no impact on the evidence of conviction. Evidence of another person's involvement in the crime fails to demonstrate the Petitioner was not involved. The new evidence does not leave this Court free from serious or substantial doubt that the Petitioner did not commit the crimes for which he was convicted. This Court finds the evidence does not clearly and convincingly establish the Petitioner's actual innocence.

Here, the Petitioner asserts that his petition evidence shows that Tammy and Sarah confessed to Heather Balderas, that family members knew of Tammy's and Sarah's involvement in the victim's murder because of these confessions; that Sarah's drug addiction may have motivated the victim's killing; that Tammy agreed to take responsibility for the murder pursuant to an agreement she had with Sarah, wherein Sarah agreed to financially support her while in prison; and that his own confession to the crimes was unreliable.

We will now evaluate each piece of the petition evidence to determine whether it clearly and convincingly establishes the Petitioner's actual innocence of the offenses:

**A. Freddy Brown's Affidavit:** In this affidavit, Brown states that he heard Heather Balderas, John Vance, and other members of Heather's family state that Sarah Vance was responsible for the victim's murder. He said Heather told him that there was an arrangement between Tammy and Sarah, wherein Tammy agreed to accept responsibility for the victim's murder in exchange for Sarah taking care of Tammy financially while she was in prison. In addition, Brown stated in the affidavit that Heather told him that Sarah and Tammy committed the murder together, that a hammer was the murder weapon, and that the reason the murder was committed was to provide money for Sarah's crack cocaine addiction. Even if we assume this evidence is true, Brown's affidavit does not clearly and convincingly show his actual innocence because Tammy's testimony, along with other proof presented at the Petitioner's trial, revealed the same facts contained within Brown's

affidavit. Moreover, the petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

Moreover, the affidavit's reference to Sarah's 2022 letter to Heather with the photograph of the victim and Brown's 2017 to 2022 observations of Sarah's quick temper also did not provide clear and convincing evidence of the Petitioner's actual innocence. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.") (emphasis added).

**B. Tyler Landers's Affidavit:** In this affidavit, Landers stated that Tammy's letter to Heather stated that Tammy and Sarah were responsible for the victim's murder, that Tammy and Sarah took the victim's truck, that sometime after the victim's murder, Tammy and Sarah returned to the victim's home and stole his television and checks and money, and that Sarah "poured kerosene or something" on the victim to prevent the victim's body from smelling. Even if we assume this evidence is true, Landers's affidavit does not clearly and convincingly show the Petitioner's actual innocence because Tammy's testimony, as well as other evidence presented, revealed the same facts contained in Landers's affidavit. We reiterate that petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

Lastly, even if we assume that Landers's 2022 observations of Sarah's violent tendencies, Sarah's nervousness at the mention of the victim's murder, Sarah's drug usage and failure to take her bipolar medication, and Sarah's claim that she would "get away" with slashing her husband's throat during argument are true, this evidence does not clearly and convincingly establish the Petitioner's actual innocence. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.")(emphasis added)).

**C. Carleigh Balderas's Affidavit:** In this affidavit, Carleigh stated that Heather Balderas told her that Tammy and Sarah were responsible for the victim's death and that Sarah "poured bleach" on the victim before taking his truck. Even if we assume these facts are true, the jury heard proof of these same facts at trial, and this evidence does not clearly and convincingly establish the Petitioner's actual innocence. We also reiterate that petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

Moreover, even if we assume that Carleigh's observations, many years after the Petitioner's trial, about Heather Balderas's and Sarah Vance's volatile relationship, Sarah's harassment of Heather Balderas, and Sarah's failure to put money on Tammy's prison account are true, these facts also do not clearly and convincingly establish the Petitioner's actual innocence. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.")(emphasis added)).

**D.** **Gracee Balderas's Interview:** During this interview, Gracee stated that Tammy pawned the victim's belongings and used his truck, that Heather told her that Tammy and Sarah were responsible for the victim's death, that one of them poured bleach down the victim's throat, that Sarah bashed the victim's head in with a hammer, that efforts were made to reduce the smell of the victim's decomposing body, and that the Petitioner had no part in the victim's death. The jury heard proof of these same facts at trial. Evidence was presented at trial indicating that the victim's deceased body was covered in cleaning chemicals and kept at a cool temperature to reduce its smell, that Tammy used the victim's truck and pawned the victim's things, that Sarah and Tammy were placed at the victim's home shortly before his death, that Sarah bashed the victim's head in with a hammer, that Tammy "covered" for Sarah when she confessed to the victim's murder, and that several family members of Tammy and Sarah believed that the Petitioner had no part in the victim's death. Even if we assume these facts are true, this evidence does not clearly and convincingly establish the Petitioner's actual innocence. We also reiterate that petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

The remaining facts disclosed during this interview include Tammy's death in prison, Tammy's sending a letter with a photograph of the victim to Heather Balderas, Sarah's illegal drug use and abusive nature toward Gracee and other family members, Sarah's failure to take her bipolar medicine around Gracee, and Sarah's behavior toward Tammy many years after the victim's death. Even if we assume these facts are true, this evidence took place many years after the Petitioner's trial and does not clearly and convincingly establish the Petitioner's actual innocence. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.")(emphasis added)).

**E.** **Chawonna Jefferson's Affidavit:** All of the facts in Chawonna Jefferson's affidavit were known to the Petitioner at the time of his trial: that Tammy Vance and Sarah Lucas rented a room in Snow Jefferson's home, that Tammy had an injury on her forehead

from a man who she claimed hit her and then checked himself into rehab, that Tammy and Sarah used the victim's truck, that the victim's cell phone belonged to Tammy and Sarah, that the Petitioner did not receive the victim's cell phone for taking part in the crime, that Chawonna never observed the Petitioner return home with blood on his clothing or body, that the Petitioner never told Chawonna about the victim or about traveling to the victim's home to commit a crime, that Chawonna had no knowledge that the Petitioner knew the victim or that the Petitioner was involved in the charged offenses, that the police employed aggressive and intimidating tactics during Chawonna's interrogation, that the Petitioner admitted to the charged offenses after an overnight police interrogation, that the Petitioner had trouble reading and writing, that the police did not allow Chawonna to talk to the Petitioner at the station, that Chawonna believed she and the Petitioner were caught up in this case because Snow Jefferson was a confidential informant, looking to make money, when she told the police about the victim's stolen truck, that Chawonna was allowed to return home because she maintained her innocence, that the Petitioner always maintained his innocence to Chawonna, and that the Petitioner's statement to police was the only thing connecting him to these crimes. Although the Petitioner claims that Chawonna's affidavit contradicts the State's theory at trial that the Petitioner received a cell phone as compensation for his participation in the victim's murder and corroborates his claim of coercive police interrogation tactics, the jury heard proof that Tammy and Sarah left behind a cell phone, heard evidence concerning the circumstances of the Petitioner's interrogation from the Petitioner and the two officers involved, heard the Petitioner's testimony that he falsely confessed, and heard Snow's testimony that she never saw the Petitioner in possession of any of the victim's property. Even if we assume these facts are true, the evidence in Chawonna's affidavit does not clearly and convincingly establish the Petitioner's actual innocence because the Petitioner's confession and other corroborating proof placed the Petitioner in the victim's apartment when the victim was murdered. Moreover, petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

**F. <u>Tammy Vance's 2018 letter to Sarah Lucas:</u>** In this letter, Tammy claims that she protected Sarah from going to prison and let an innocent man take her place. At trial, Tammy testified that the Petitioner was not involved in the victim's death. During her trial testimony, Tammy inculpated Sarah in the victim's death but claimed she pled guilty to prevent Sarah Lucas from going to prison; Tammy also said she implicated the Petitioner, even though he was innocent of the charged offenses in this case. Even if we assume these facts are true, the jury heard the same facts at trial, and the evidence of Tammy's letter to Sarah does not clearly and convincingly demonstrate the Petitioner's actual innocence. We also reiterate that petition evidence suggesting that Sarah Lucas was involved in the offenses at issue does not exclude the Petitioner from participating in these offenses.

**G. Oklahoma Police Records**: The facts in these records concern offenses, mainly involving Sarah's threats, harassment, and thefts, that occurred during the period from 2022 to 2023, many years after the date of the Petitioner's trial. Even if we assume the facts in the Oklahoma records are true, they could not have been presented to the jury at the Petitioner's initial trial, and they do not clearly and convincingly establish the Petitioner's actual innocence because they are unrelated to the Petitioner and the crimes at issue in this case. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.")(emphasis added)).

**H. Teresa Davis's Interview:** The facts disclosed during this interview concerned Billy Davis's suicide, which occurred in 2023, several years after the Petitioner's trial. Even if we assume these facts are true, they could not have been presented to the jury at the Petitioner's initial trial, and they do not clearly and convincingly establish the Petitioner's actual innocence because they are unrelated to the Petitioner. See Payne, 493 S.W.3d at 485 (stating that the goal of coram nobis relief "is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial.")(emphasis added)).

**I. Sarah Lucas's recorded phone call:** In this recorded phone call, Sarah repeatedly denies any involvement with the victim's murder and asserts that Tammy implicated her in the victim's murder at trial because Sarah refused to give Tammy money while she was in prison. This is consistent with Sarah's testimony at the Petitioner's trial. During this phone conversation, Sarah seems to inculpate the Petitioner by stating that the person "sitting in jail did what he did" and by asserting that the Petitioner often rode around with Tammy in the victim's truck. Even if we assume these facts are true, the evidence in this recorded phone call does not clearly and convincingly show the Petitioner's actual innocence.

**J. Dr. Neuschatz's Expert Report:** Dr. Neuschatz's report is simply a new expert opinion about the details of the Petitioner's interrogation and subsequent confession. See Lowery, 2019 WL 2578623, at *21 (stating that new expert opinions on already presented evidence are not sufficient for error coram nobis relief). The Petitioner provided extensive testimony at trial that the conditions of his interrogation resulted in a false confession, and the jury heard testimony from two officers concerning the details of the Petitioner's interrogation. Hayes I, 2012 WL 3192827, at *4-6, *8-9. At the time of trial, the Petitioner was well aware of the issues concerning his interrogation. Dr. Neuschatz admits in his report that the interrogation methods used on the Petitioner could increase the likelihood of a confession from both a guilty and an innocent person. In addition, Dr. Neuschatz

stated that he could not comment on the veracity of the Petitioner's statements and that he did not know whether the Petitioner committed the offenses in this case. Assuming the facts in Dr. Neuschatz's report are true, this evidence does not clearly and convincingly show the Petitioner's actual innocence.

After evaluating the petition evidence, we conclude that the Petitioner's ten pieces of evidence do not establish his actual innocence, whether considered separately or collectively. Although the coram nobis court is required to assume that the new evidence is true and credible, it does not need to consider it in isolation from the proof supporting the Petitioner's conviction. See McKissack v. State, No. M2024-01110-CCA-R3-ECN, 2025 WL 1198845, at *6 (Tenn. Crim. App. Apr. 24, 2025) (concluding that a codefendant's recanted testimony did not "clearly and convincingly" establish the petitioner's actual innocence when this testimony was considered along with the substantial evidence of petitioner's guilt), perm. app. denied (Tenn. Sept. 11, 2025). Evidence suggesting that Sarah Lucas was involved in the offense does not show that the Petitioner was not also involved. We fully agree with the coram nobis court's conclusion that the petition evidence does not leave us "free from serious or substantial doubt that the Petitioner did not commit the crimes for which he was convicted." Therefore, we conclude that the petition evidence failed to clearly and convincingly establish the Petitioner's actual innocence.

**IV.  Court's Application of the Tolling Standard Under Clardy.**  Lastly, the Petitioner argues that the coram nobis court conflated the merits standard with the tolling standard when it analyzed the petition evidence under Clardy. He claims that although the coram nobis court purported to consider only the Petitioner's request to toll the statute of limitations, the court's ruling "demonstrates that [it] employed a merits standard at key stages of the analysis by implicitly and explicitly asking whether the new evidence would have made a difference at trial. He asserts that this was error because "the analysis for relief on the merits of the petition is separate and distinct from the analysis for whether the statute of limitations may be tolled" and that the court's conflation of these two standards improperly impacted its evaluation of his petition. Clardy, 691 S.W.3d at 409. The Petitioner insists that "if tolling is granted," the coram nobis court may "then proceed to address the merits of the coram nobis petition, under the standards in the coram nobis statute." Id. The State responds that the coram nobis court did not conflate the merits standard with the tolling standard but instead properly analyzed the petition evidence before concluding that this evidence did not establish the Petitioner's actual innocence. We agree with the State.

We recognize that a coram nobis petitioner must satisfy a substantially higher burden to toll the statute of limitations than to obtain relief on the merits. If a petition for error coram nobis is filed within the statute of limitations, "the statute does not mandate

- 46 -

that the newly discovered evidence show actual innocence." Id. Instead, for a timely filed coram nobis petition, relief is available if the newly discovered evidence "may have resulted in a different judgment, had it been presented at the trial[.]" Tenn. Code Ann. § 40-26-105(b).

The Petitioner asserts that the only question in the Clardy tolling analysis is whether the new evidence, if taken as true, clearly and convincingly establishes that a petitioner is actually innocent of the conviction crimes. Clardy, 691 S.W.3d at 409. He insists that if the coram nobis court had taken all his petition evidence as true, then he has met his burden under Clardy. Consequently, he asks this court to reverse the summary dismissal of his petition and remand his case so he can present the merits of his petition evidence at a hearing to obtain coram nobis relief.

As his first example, the Petitioner claims the court used the merits standard rather than the tolling standard when it determined that the petition evidence was not "new" because it was cumulative or only served to contradict or impeach other evidence. See Wlodarz, 361 S.W.3d at 499 ("[A]s a general rule, newly discovered evidence which is merely cumulative or 'serves no other purpose than to contradict or impeach' does not warrant the issuance of a writ.") (emphasis added) (citing Hart, 911 S.W.2d at 375). He asserts that the evidence sufficient to justify issuance of the writ must meet a different standard than evidence required to trigger the tolling of the statute of limitations and that if the standards were the same, there would be no need for the two-part analysis in Clardy.

As his second example, the Petitioner asserts that the coram nobis court repeatedly considered whether the petition evidence "would have resulted in a different judgment," which references the language of the coram nobis statute. The Petitioner asserts that to analyze whether evidence "would have resulted in a different judgment," the court must necessarily address the merits by determining "whether the 'new' evidence offered by the petitioner is credible." Clardy, 691 S.W.3d at 405. He asserts that this is not the proper standard when determining if a petitioner is entitled to equitable tolling of the statute of limitations.

The record shows that the coram nobis court identified the tolling analysis in Clardy and then properly applied it to the Petitioner's evidence in his petition. The court repeatedly asserted that it was accepting the petition evidence as true before finding that this evidence did not establish the Petitioner's actual innocence. While the coram nobis court did occasionally mention that the petition evidence was cumulative or served no purpose other than to contradict or impeach the trial evidence, our review of the order shows that the coram nobis court made these observations in the context of whether the petition evidence was "newly discovered." Moreover, although the Petitioner claims the coram nobis court repeatedly referred to whether the evidence would result in a different

- 47 -

judgment had it been presented at trial, see Tenn. Code Ann. § 40-26-105(b), we believe the order shows that the court properly considered whether the Petitioner had established his actual innocence, not whether he was entitled to relief on the merits of his petition. Accordingly, we conclude that the coram nobis court did not conflate the merits standard with the tolling standard when analyzing the petition evidence under Clardy.

The Petitioner's evidence, taken as true, fails to clearly and convincingly prove that he is actually innocent of the conviction offenses of first degree felony murder and aggravated robbery. Accordingly, we conclude that the coram nobis court correctly concluded that the Petitioner was not entitled to equitable tolling and acted properly in summarily dismissing the petition in this case.

## CONCLUSION

The Petitioner has not shown that he is entitled to equitable tolling of the statute of limitations. His petition is untimely, and the Petitioner has failed to present newly discovered evidence that would, if credited, clearly and convincingly show that he is actually innocent of the underlying crimes. Therefore, the judgment of the coram nobis court is affirmed.

s/_____Camille_____R. McMullen_____

CAMILLE R. MCMULLEN, JUDGE